[Civ. No. 47576. Second Dist., Div. One. Dec. 30, 1976.]

RICHARD S. SCOTT et al., Plaintiffs and Appellants, v.
FAMILY MINISTRIES, Defendant and Appellant;
STATE DEPARTMENT OF HEALTH,
Real Party in Interest and Respondent;
LAVERN HENRY LANGENWALTER et al.,
Interveners and Respondents.

COUNSEL

Miller, Glassman & Browning, Anthony Michael Glassman, Jane D. Saltsman and Richard Stanley Scott for Plaintiffs and Appellants.

Fred Okrand, Jill Jakes, Mary Ellen Gale and Jo Ellen Mitchell as Amici Curiae on behalf of Plaintiffs and Appellants.

Yates & Nissen and David R. Nissen for Defendant and Appellant.

Evelle J. Younger, Attorney General, N. Eugene Hill, Assistant Attorney General, Ronald V. Thunen, Jr., and Anne S. Pressman, Deputy Attorneys General, for Real Party in Interest and Respondent.

No appearance for Interveners and Respondents.

OPINION

THOMPSON, J.—The appeal at bench tests the right of a private state-licensed adoption agency to impose religious restrictions upon prospective adoptive parents over and above the religious matching requirements of California Administrative Code, title 22, section 30643. It raises incidental insubstantial issues of the sufficiency of pleadings, standing, and a claim of prejudice of the trial judge.

██ We determine that by reason of the significance of private-licensed adoption agencies in the California statutory scheme and the extent to which the California law delegates to those agencies the governmental function of performing the steps leading to judicially authorized adoption, the activity of the agencies is state action. ██ Accordingly, we conclude that if section 30643 of title 22 of the Administrative Code is to be given a constitutional construction it must be interpreted as precluding the imposition of religious requirements upon prospective adoptive parents beyond the religious matching provisions of the section.

*Facts*

██ World Vision is an evangelical Christian relief organization operating in 30 countries. One of its principal functions is the operation of orphanages and child care centers. World Vision began relief work in Cambodia in 1970 with the consent of the Cambodian govern-

ment. In 1974, it established the Tuol Kauk Nutrition Center in Phnom Penh. The center cared for needy children, as many as 120 at one time. Generally, the center admitted seriously ill children coming from refugee camps. Children who recovered and who had family or friends to care for them were discharged. Others remained in the care of the center. The Cambodian government authorized the center to find homes for children within its care, and seven were placed for adoption. If a child was brought to the center by a relative, a "relinquishment" was obtained. If the child was brought to the center by a nonrelative, no "relinquishment" was required. Persons bringing children to the center were told that the child could be placed for adoption in a Christian home, possibly in another country.

Ninety-two percent of the population of Cambodia is Buddhist.

In April 1975, when the Cambodian tragedy escalated to disaster, World Vision decided to evacuate the children in its care as the capture of Phnom Penh by the Khmer Rouge became imminent. Twenty Cambodian children were evacuated on a World Vision chartered airplane from Phnom Penh to Thailand with the consent of the Cambodian government. Nineteen of the children reached the United States on a United States government flight and the twentieth was brought to the United States by the director of World Vision.

To comply with the immigration law, the 20 children were paroled into the United States by the Attorney General for the purpose of adoption. World Vision is not a California licensed adoption agency. World Vision transferred custody of the 20 children to Family Ministries with instructions that they be placed in Christian homes.

Family Ministries serves the evangelical Protestant religious community and places children for adoption only in evangelical Protestant homes. It requires adherence to a prescribed statement of faith and active membership in an evangelical Protestant church by all potential adoptive parents of children placed for adoption by it. Among other adherents of religious faith, Catholics, Episcopalians, Jews, Mormons, Seventh Day Adventists, and Buddhists are not members of an evangelical Protestant church.[1]

---

[1]By no means do all private or religiously sponsored state-licensed adoption agencies impose similarly strict religious restrictions upon prospective adoptive parents. 5A Goddard, California Family Law Practice, Appendix 4, page 378 et seq., lists Catholic Welfare Bureau of Sacramento, Holy Family Adoption Service, and Infant of Prague

Richard Scott, a medical doctor by profession and Episcopalian by religious persuasion, was among a group of physicians present at Los Angeles airport to attend the 20 Cambodian children when they arrived in the United States. He examined Toop Ven, one of the children, and found him physically sound. As Toop Ven was carried aboard a bus, he was struck by the bus door so that he required hospitalization for a scalp laceration. Dr. Scott attended Toop Ven in the hospital.

Dr. Scott telephoned Family Ministries to inquire concerning Toop Ven's status and the procedure for adopting the child. Family Ministries sent Scott a written statement of its requirements for adoptive parents. Scott signed the "statement of faith" required by Family Ministries. He was informed by Family Ministries, however, that as an Episcopalian he was not a member of an evangelical Protestant church and hence was not qualified to adopt Toop Ven. Scott did not pursue further effort to secure the adoptive placement of Toop Ven from Family Ministries.

On April 25, 1975, Dr. and Mrs. Scott, suing for themselves and on behalf of Toop Ven, filed a complaint seeking to enjoin Family Ministries from enforcing its religious eligibility requirement and from taking any steps leading to the adoption of Toop Ven. The same day, Dr. and Mrs. Scott filed their petition to adopt Toop Ven.

On May 15, the Scotts, on their own account and on behalf of Toop Ven, filed an amended complaint alleging that the Episcopalian faith pursued by the Scotts rendered them ineligible for adoptive placement of children in the custody of Family Ministries and facts respecting the unknown religious affiliation of "Asian" refugee children in the care of Family Ministries. The amended complaint seeks injunctive relief restraining Family Ministries from taking steps leading to the adoption of Toop Ven, the relinquishment of custody by Family Ministries of Toop Ven and other Asian children in its care to "either a county, state or private non-sectarian adoption agency," and ordering that the children "be subject to only non-sectarian adoption to be handled by either county, state or private non-sectarian adoption agencies." On May 16, the court granted a preliminary injunction against Family Ministries restraining it for 60 days from taking steps to place Toop Ven for adoption.

---

Adoption Service as placing children with "members of an established church." Children's Bureau of Los Angeles is listed as having no religious requirement, and Children's Home Society of California is shown as accepting applications for adoptions "from all races and religions." (*Id.*, pp. 381-384.)

On May 21, 1975, the trial court denied the Scotts' application for a temporary restraining order expanding the preliminary injunction and refused to issue an order to show cause re a modification of the existing injunction. Its order says: "Amended complaint fails to state a cause of action for relief requested." The court ordered that written notice of any further applications for injunctive relief be given the Attorney General on behalf of the California Department of Health. The suit seeking injunctive relief and the petition for adoption were consolidated on May 22.

On May 27, Dennis B. Guernsey, the executive director of Family Ministries, presented an ex parte application for appointment as guardian ad litem of Toup Ven to a commissioner sitting in a different department from that in which the matters were pending. The application was granted but the appointment was vacated on June 11 by the judge presiding over the case.

On June 16, 1975, Family Ministries moved to strike the complaint and filed a general demurrer to it on the ground that the Scotts lacked capacity to sue on behalf of Toup Ven and the other children and that the amended complaint failed to state a cause of action. The Scotts responded with Dr. Scott's petition to be appointed guardian ad litem of Toup Ven and the other "Asian children."

On June 30, the court denied Dr. Scott's petition for appointment as guardian ad litem without prejudice, but continued it to July 18 "for the purpose of retaining jurisdiction." Family Ministries' demurrer and motion to strike were submitted. On July 7, the court granted Dr. Scott's petition and appointed him guardian ad litem of Toup Ven and the other children. On July 8, it filed its formal order reciting that its denial of the Scotts' application of May 21 had occurred because the court was of the opinion that the State Department of Health should appear as a party, and that since that time the department had made it clear that it took no position in the matter. The court concluded that someone was needed to represent the children, thus explaining its approval of Dr. Scott as their guardian ad litem. The order vacates the prior court action with respect to the May 21 application and modifies the preliminary injunction of May 16 to also restrain Family Ministries from enforcing its religious restriction in the placement of any of the children and from placing any of them for adoption. The preliminary injunction is ordered to remain in effect until further order of the court. The order provides that Family Ministries is authorized to continue care and control of the children.

The formal order of July 8 denies Family Ministries' motion to strike and overrules its demurrer.

Trial proceeded on the action for injunctive relief but not on the petition for adoption. On December 2, 1975, the trial court determined the matter. Its judgment: (1) restrains Family Ministries from exercising custody or control over the children and from placing them for adoption without further order of court; (2) orders Family Ministries to transfer custody of the children to the Los Angeles County Department of Adoptions; (3) vacates adoptive placements and placements for temporary or foster care of the children previously made by Family Ministries; (4) transfers custody of the children to the Los Angeles County Department of Adoptions; (5) orders that, until further order of court or administrative action by the Department of Adoptions, the children may remain in the homes in which they had been placed for adoption or foster care; (6) orders the Department of Adoptions to select "parents who are best able to meet each child's needs, without regard to the religion of the prospective parents"; (7) authorizes the Department of Adoptions to treat the children as if they had been relinquished to the department pursuant to Civil Code section 224m; (8) expressly provides that the judgment shall be construed not to exclude as potential adoptive parents persons with whom the children had previously been placed for adoption or temporary care or to prohibit the department from engaging in cooperative placement with listed adoption agencies outside Los Angeles County; and (9) continues the jurisdiction of the court over the matter.

The judgment does not rule upon the Scotts' petition to adopt Toup Ven.

Family Ministries appealed from the entire judgment. The Scotts appealed from the portion of the judgment which does not award them attorney's fees.

*Pleadings, Standing, Asserted Bias of*
*Trial Judge*

Family Ministries contends that: (1) the amended complaint is legally inadequate for failing to allege that the Scotts are eligible to adopt Toup Ven or to allege any deprivation of Toup Ven's rights; (2) Dr. Scott lacks capacity to act as guardian ad litem for the children; (3) the trial court erroneously vacated a prior ruling to the effect that the amended

complaint does not state a cause of action; and (4) bias and prejudice of the trial judge denied Family Ministries a fair trial.

The contentions lack merit. For reasons which we expand in the appendix to this opinion (See *post,* pp. 509-510.) to avoid distraction from the real issue of the case, the record establishes that the amended complaint contains factual allegations showing that Dr. and Mrs. Scott are aggrieved by denial of their right to be considered as potential adoptive parents through Family Ministries application of its religious restrictions and that Dr. Scott properly appeared as the appointed guardian ad litem of the children who are also aggrieved by Family Ministries' restriction upon persons who may adopt them. The trial court clearly had the power to modify its earlier preliminary order (3 Witkin, Cal. Procedure (2d ed.) Pleading § 836). The record does not indicate that the trial judge was biased or prejudiced.

### California Statutory Scheme of Adoption

"Adoption, the creation by law of the parent-child relationship, was unknown to the common law." (2 Armstrong, Cal. Family Law, p. 1175.) "The California Civil Code provides for five types of adoptions: 1) adoption of an adult by an adult; 2) adoption by a stepparent of a child which is in the custody and control of his spouse as its natural or adoptive parent; 3) adoption by the biological father of his illegitimate child; 4) so-called independent or direct adoption, in which the biological parent or parents select adoptive parents, place the child with them and consent to the adoption by them; 5) so-called relinquishment or agency adoption, in which the biological parent or parents turn the child over to a licensed adoption agency, execute and deliver to the agency a general relinquishment of rights and responsibilities and in which the agency then selects the prospective adoptive parents and places the child with them." (tenBroek, *California's Adoption Law and Programs,* 6 Hastings L.J. 261, 263.) ■ A proceeding declaring a child free of parental custody and control because of his abandonment serves as a substitute for parental consent. (Civ. Code, § 232; *In re Kitchens* (1953) 116 Cal.App.2d 254, 262 [253 P.2d 690].)

In the case at bench we deal with the agency-relinquishment form of adoption.[2] Both persons or organizations licensed by the state (Health &

[2]The parties to this appeal treat the matter as governed by the law applicable to agency-relinquishment adoptions. We accept that treatment.

Saf. Code, §§ 1253 and 1298 [former Welf. & Inst. Code, § 16000]) and counties similarly licensed (Welf. & Inst. Code, § 16100) are authorized to act as adoption agencies.

California statutes and administrative regulations delegate equally to county- and private-licensed adoption agencies:

> responsibility for the care of the relinquished child together with the right to his custody and control (Civ. Code, § 224n);

> the obligation to provide adequate services to natural parents, including casework service and referral to other agencies so that assistance is given natural parents in making the best plan for the child and themselves (Cal. Admin. Code, tit. 22, § 30593);

> the obligation to study the natural parents to determine their identification, personality and temperament, religion and religious preference for the child, health, marriages, other children and other relevant data which will be helpful in planning for the child (Cal. Admin. Code, tit. 22, § 30595);

> the obligation carefully to study each child accepted for adoption service to determine his needs and capacities and to use the study in the selection of the family which can provide the best setting for the growth and development of the child (Cal. Admin. Code, tit. 22, § 30605);

> the obligation to consider the needs of children in the care of other California agencies (Cal. Admin. Code, tit. 22, § 30627);

> the power and obligation to evaluate applicants desiring to adopt a relinquished child with respect to age, nationality and race, motivation for adoption, preference for a child, capacities and attitudes, personal relationships and personality, marriage, health, employment and finances, religion, education, and environment (Cal. Admin. Code, tit. 22, § 30637);

> the power to terminate a placement for adoption at the discretion of the agency (Civ. Code, § 224n); and

> the right to petition the court for removal of a child from adoptive parents with whom the agency has placed him (Civ. Code, § 224n).

"No petition may be filed to adopt a child relinquished to a licensed adoption agency or a child declared free from the custody and control of either or both of his parents and referred to a licensed adoption agency for adoptive placement, except by the prospective adoptive parents with whom the child has been placed for adoption by the adoption agency." (Civ. Code, § 224n.)

When a petition for adoption is filed, adoptive placements of licensed agencies are treated differently than private adoptions.

In adoptions not resulting from agency placements the petitioning parties must supply information to the State Department of Health to permit it to investigate the proposed adoption. The information is not required in adoption proceedings relating to a child placed by a licensed agency. (Civ. Code, § 226.) In cases where the consent of the natural parent is not required and a licensed agency is not a party to the petition, the State Department of Health or a county adoption agency must consent before a petition for adoption is granted unless the court grants special relief. Consent of the department or county agency is not required where a licensed agency is a party. (Civ. Code, § 226.3.)

The State Department of Health or a county adoption agency must interview the parties to the adoption and submit a report of the facts disclosed by its inquiry with a recommendation to the court. (Civ. Code, § 226.6.) The requirement of investigation may be waived where a licensed private adoption agency joins in the petition to adopt. (Civ. Code, § 226.6.)

The process culminates in state court action entering a decree of adoption when the court is satisfied that "the interest of the child will be promoted." (Civ. Code, § 227.)

### Religious Matching in Adoption

Virtually all states embody religious considerations, albeit with different degrees of conclusiveness, in their adoption laws. (Note, *Infants: Adoption: Religion as a Criterion in Adoption Proceedings,* 6 UCLA L.Rev. 459.) California's religious requirement is contained in California Administrative Code, title 22, section 30643. That section states: "In choosing adoptive parents for a child the [licensed adoption] agency shall select from its approved applicants the family which is best able to meet his needs. [¶] The child shall be placed with adoptive

parents whose religious faith is the same as his own or that of his parents. Exception can be made in accordance with the expressed wishes of the parent(s)."[3]

When religion is a factor in the adoption process, there is an inevitable tension between the state action involved in the procedure by which the state creates the incidents of parent and child (*Estate of Pierce* (1948) 32 Cal.2d 265, 268-269 [196 P.2d 1]) and the establishment of religion clauses of the United States (First Amend.) and California (art. I, § 4) Constitutions (tenBroek, *California's Adoption Law and Programs,* 6 Hastings L.J., 261, 315-317; Comment, *Religion, Adoption and the First Amendment,* 7 Stan.L.Rev., 394, 402).

Many states resolve the tension and avoid unconstitutionality of religious considerations by "religious matching" provisions similar to those contained in the California Administrative Code. (Note, *Infants— Custody, Property* and *Maintenance—Children's Religion Held Sole Criterion in Proceedings against Welfare Agency for Change of Custody,* 65 Harv.L.Rev. 694; Note, *Religion as a Factor in Adoption, Guardianship and Custody,* 54 Colum.L.Rev. 376.) ■ Religious matching to one degree or another requires or gives preference to adoption by parents of the same faith as that of the natural parents of the child or of a religion for which the natural parents express a preference. (See, e.g., *Dickens* v. *Ernesto* (1972) 30 N.Y.2d 61 [330 N.Y.S.2d 346, 281 N.E.2d 153].) The process preserves constitutionality by placing the state in a neutral position in which parentage or parents and not the state determines the religion of the home into which the child is to be adopted. (*Petitions of Goldman* (1954) 331 Mass. 647 [121 N.E.2d 843]; cert. den., 348 U.S. 942 [99 L.Ed. 737, 75 S.Ct. 363].) It recognizes the common law right of a natural parent to control the religious upbringing of his child. (Friedman, *The Parental Right to Control the Religious Education of a Child,* 29 Harv.L.Rev. 485.)

If, however, the state is permitted to specify the religious affiliation of the adoptive home without reference to natural parentage or parental preference, the state is no longer in the position of neutrality nor can the religious requirement be sustained upon the common law right of the natural parent. Then the state invades the area proscribed to it by the establishment clauses of the United States and California Constitutions. (*Petitions of Goldman, supra,* 121 N.E.2d at p. 846.)

---

[3]The third paragraph of section 30643, applicable to physically handicapped children only, is not here relevant.

A religious requirement imposed upon adoptive parents by the state is thus unconstitutional unless it is limited to religious matching. If title 22, California Administrative Code, section 30643 is to be constitutional, it must be construed to provide for state action placing a child for adoption on the basis of religion only where the religion is that of the child or of his natural parent or is the parent's express preference. Because we are obligated to construe the section as constitutional rather than unconstitutional if possible, we adopt that construction.

The California statutory scheme is framed in a fashion which makes action of private licensed adoption agencies state action in the context of the establishment clauses.

██ "[T]he three main evils against which the Establishment Clause was intended to afford protection [are]: 'sponsorship, financial support, and active involvement of the sovereign in religious activity' . . . . [¶] Every analysis in this area must begin with consideration of the cumulative criteria [of constitutionality] developed by [the Supreme] Court over many years. . . . First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion [citation]; finally, the statute must not foster 'an excessive government entanglement with religion.' [Citation.]" (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755, 91 S.Ct. 2105]; see also *Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 770-773 [37 L.Ed.2d 948, 961-963, 93 S.Ct. 2955].)

██ Here the California statutory and regulatory scheme of adoption does not further a secular purpose unless it is construed to require the licensed adoption agency to maintain a position of neutrality by enforcing a religious requirement upon prospectve adoptive parents only to achieve religious matching. Here the effect of the scheme advances particular religions if the agencies are permitted to impose a religious requirement beyond matching. Here the state government is inextricably entangled with the activity of licensed adoption agencies so as also to be entangled with any religious restriction beyond matching imposed by them upon prospective adoptive parents.

The agencies are delegated the governmental case work function in the adoption process. The state delegates to them the process of investigation and reporting to the court that in nonagency adoptions must be performed by the State Department of Health. The state

delegates to the private licensed agencies the state's power and obligation to select adoptive parents and to bar all others from the right to adopt the particular child. The state delegates to the agencies the power to exercise discretion to institute a termination of a placement for adoption. In essence if a private-licensed adoption agency imposes a religious restriction in exercising its delegated power and responsibility it is acting for and on behalf of the state when it does so.

We thus conclude that Family Ministries is bound by our construction of California Administrative Code, title 22, section 30643 to the same extent as the state itself is bound.

■ Family Ministries seeks to avoid the impact of that conclusion by arguing that World Vision as custodian of the Cambodian children stands in the relationship of *loco parentis* so as to be entitled to express a parent's religious preference pursuant to section 30643. The argument lacks merit.

In *Adoption of McDonald* (1954) 43 Cal.2d 447 [274 P.2d 860], an adoption agency argued that because a child had been released to it for adoption it had acquired the statutory right of a parent to consent to or refuse adoption. Our Supreme Court held that the statutory reference to parents meant only natural parents and not an agency standing in their stead. *Adoption of McDonald* compels rejection of Family Ministries' reliance upon religious preference expressed by World Vision.[4]

### Trial Court's Judgment Removing Children From Custody of Family Ministries

■ The construction of California Administrative Code, title 22, section 30643 which we here adopt validates the trial court's decision removing the children from the custody of Family Ministries and placing their custody in the Los Angeles County Department of Adoptions. The section precludes Family Ministries from imposing a religious requirement upon prospective adoptive parents of children of unknown religion and unknown parentage. Family Ministries places children for adoption only with families who are active members of an evangelical Protestant church. It is thus incapable of complying with section 30643 in placing the "Asian children."

---

[4]Cases cited by Family Ministries as supporting a contrary result are all distinguishable on their facts. None are adoption cases. (See, e.g., *Buelke* v. *Levenstadt* (1923) 190 Cal. 684 [214 P. 42]; *Trudell* v. *Leatherby* (1931) 212 Cal. 678 [300 P. 7] [overruled on other grounds in *Gibson* v. *Gibson* 3 Cal.3d 914, 923 (92 Cal.Rptr. 288, 479 P.2d 648)]; *Estate of Teddy* (1963) 214 Cal.App.2d 113 [29 Cal.Rptr. 402]; and *Loomis* v. *State of California* (1964) 228 Cal.App.2d 820 [39 Cal.Rptr. 820].)

Significantly, the trial court order does not exclude as prospective adoptive parents persons with whom Family Ministries has placed the children, either pursuant to the vacated adoptive placements or as foster parents. The Los Angeles County Department of Adoptions is thus free, and presumably required, in the best interests of the children, to consider the potential emotional trauma of removing any one of them from his current environment for the purposes of adoption and the advantage to each child of continuity through adoption in the home where he is now placed.

### Attorney's Fees

The Scotts appeal from the portion of the judgment which denies them attorney's fees. They argue that they are entitled to the fees because of the benefit they have caused to accrue to the children, the private attorney general concept, and the "obdurate attitude" of the Attorney General in not protecting the rights of the children.

The general issue raised by the Scotts' appeal is pending before the Supreme Court in *Serrano* v. *Priest* (Los Angeles Super. Ct. No. 30398). Ordinarily, we would defer submission of this appeal until the Supreme Court speaks on the problem. The matter at bench is unusual, however. The children's status has already been in limbo far too long. We therefore decide the case.

Extended discussion is presumptuous in light of the impending definitive action of our Supreme Court. Suffice for the purpose here, we note that the Scotts' claim for attorney's fees is presented in a situation where fees have not been allowed by existing decisions. We hence accept the trial court's determination of the issue.

### Disposition

The judgment is affirmed. Each party to bear their own costs.

Wood, P. J., and Hanson, J., concurred.

Petitions for a rehearing were denied January 27, 1977, and the petitions of all the appellants for a hearing by the Supreme Court were denied February 23, 1977.

## APPENDIX

Family Ministries' contention of legal insufficiency of the amended complaint for failure to allege a wrong to the Scotts lacks merit. It is based upon argument that: (1) the complaint does not allege facts showing that any plaintiff is aggrieved; and (2) the trial court's earlier ruling that the complaint was deficient.

The complaint alleges a violation of Toup Ven's right and that of the other children to adoptive placement as provided by California Administrative Code, title 22, section 30643. It asserts a denial of the Scotts' right to be considered as adoptive parents of Toup Ven.

■ The trial court did not err by modifying its ruling on the sufficiency of the complaint. The original ruling which Family Ministries claims to be binding was one denying a preliminary injunction because of the amended complaint's failure to state a cause of action for the relief sought. That ruling was one on a preliminary matter and was therefore subject to change by the trial court. (3 Witkin, Cal. Procedure (2d ed.) Pleading, § 836.) When the court changed its ruling, additional reasons indicated that whatever may have been its conclusion as to the legal sufficiency of the complaint when it ruled on the application for preliminary injunction, the situation had changed. Dr. Scott had acquired additional standing by his appointment as guardian ad litem. The absence of the State Department of Health as a party was no longer significant.

Family Ministries argues: (1) ■ The trial court was without power to appoint Dr. Scott as guardian ad litem of the children without affording Family Ministries an opportunity to be heard on the subject of appointment; and (2) the Scotts failed to establish that Family Ministries had denied them an opportunity to adopt Toup Ven. Hence, Family Ministries contends that the Scotts lack standing in the case at bench.

■ The contention is devoid of merit. Toup Ven and the other children are the real parties in interest in the proceeding. (*Adoption of McDonald, supra,* 43 Cal.2d 447, 461.) The court could appoint a guardian ad litem for them on an ex parte application. The application does not require notice to anyone. (3 Witkin, Cal. Procedure (2d ed.) Pleading, § 58.) Here the court, having first denied the application without prejudice but having retained jurisdiction over it, properly acted on the petition without further notice. The record shows no abuse of discretion in the court's selection of Dr. Scott as the guardian. ■ Insofar as their personal standing is concerned, the Scotts established that Family Ministries had informed them, when they inquired concerning the adoption of Toup Ven, that as Episcopalians and therefore not members of an evangelical church they were not eligible for a Family Ministries placement for adoption. They are thus persons aggrieved if the religious restriction is invalidly applied to bar their right to adopt.

The record does not support Family Ministries' claim that the trial judge was prejudiced so as to deny it a fair trial. Family Ministries asserts that the trial judge was prejudiced against the State Department of Health and Family Ministries, while biased in favor of the Scotts.

The claim of prejudice against the state is bottomed upon the trial court's action in requesting the department to appear in the action and the court's subsequent expression of irritation when counsel for the Department of Health argued on the one hand that there had been no violation of section 30643, and on the other that because the religious heritage of the children was unknown they should be placed by Family Ministries without regard to religion. The trial judge very properly caused the State Department of Health to be given notice of a proceeding involving the interests of minor children. The judge's expression of irritation when counsel for the state argued inconsistently by no means establishes that he was biased or prejudiced in the action. Significantly, the Attorney General, who has filed a brief in the matter, does not assert bias or prejudice of the trial judge.

Family Ministries' claim of prejudice against it is bottomed on: (1) the trial court's receipt in evidence of testimony of Catholic prospective adoptive parents that Family

Ministries had informed them that it would cost $7,000 to adopt a child through the agency and that they were not eligible for placement because they were Catholic; (2) the court's order on its own motion during trial requiring that Family Ministries produce copies of documents relating to the Cambodian children; and (3) the court's inquiry through attorneys who had processed adoption proceedings concerning six of the Cambodian children placed by Family Ministries whether Family Ministries had violated the preliminary injunction.

A possibly erroneous ruling on evidence does not establish prejudice of the trial judge. Neither does a court's ruling requiring production of documents relevant to the subject matter of the litigation or its inquiry into the obedience by a party of an injunctive order.

Family Ministries' contention that the trial judge was biased in favor of the Scotts is founded on the court's calling a witness on its own motion, the court's proper action in ruling upon pending motions, and the trial court's invitation to the Scotts to amend their complaint at the close of the case in order to pray for attorney's fees. The action of the court in calling the witness and ruling on motions does not begin to show a bias in favor of one side or the other. The trial court can hardly be said to have been biased in favor of the Scotts when it invited the amendment to pray for attorney's fees since it denied the prayer.

Finally, Family Ministries seeks to establish the bias of the trial judge by reference to a series of rulings upon preliminary motions and the trial judge's comment on the state of the record at the time of the rulings. Again, no bias or prejudice appears. Rather, the picture is one of a trial judge explaining the reasons for his actions.