Opinion
 

 SIMS, Acting P. J.
 

 In this action seeking rescission of agreements relinquishing a child for adoption through a licensed private adoption agency, plaintiffs Lea Tyler and Matthew Darrah
 
 [1]
 
 appeal from the trial court’s judgment in favor of defendants Children’s Home Society of California (CHS), Davis Crisis Pregnancy Center, Inc. (DCPC), Kathy Huntziker, and Dee Heszler. On appeal plaintiffs contend the relinquishments are void due to the failure of adoption agency CHS and its employee Heszler to comply with Department of Social Services (DSS) regulations.
 

 
 *522
 
 We shall conclude plaintiffs have failed to show prejudice from any regulatory violations. We shall therefore affirm the judgment.
 
 [2]
 

 Factual and Procedural Background
 
 [3]
 

 On April 14, 1991, 18-year-old college freshman Tyler gave birth unattended to a premature baby girl in the bathroom of her dormitory at the University of California, Davis, while her roommates slept in adjoining rooms. Tyler’s family, friends, and roommates were unaware of the pregnancy or birth.
 

 The alleged birth father,
 
 [4]
 
 Darrah, was aware of the pregnancy. He and Tyler had become involved when they were both honor students at the same high school. At the time of the baby’s birth Darrah was a freshman at the University of California, San Diego.
 

 On April 15,1991, the day after the baby’s birth, Tyler telephoned DCPC, which advertised itself as a Christian organization offering free services to pregnant women. Tyler expressed to DCPC volunteer Huntziker an interest in placing a baby for adoption.
 

 Also on April 15th, Tyler traveled with the baby to San Diego, where they spent five days at Darrah’s apartment while Tyler and Darrah discussed their situation.
 

 
 *523
 
 On April 21st, Tyler and the baby returned to Davis and met with Huntziker and Heszler, a field representative for CHS. Heszler had been contacted by Huntziker, who related that Tyler was interested in immediate foster care and placement of the baby for adoption.
 

 At the meeting on April 21st, Tyler stated she and Darrah decided after much discussion to place the baby for adoption. Tyler said she could not tell her parents about the birth. Her parents did not even know about the pregnancy or that she was sexually active. They were a traditional family. Tyler was a role model for her two younger sisters. She could not disappoint her parents. Tyler was consistent throughout the interview that she and Darrah had decided on adoption as their choice. Tyler wished to proceed quickly in order to allow the baby to bond with adoptive parents.
 

 Heszler encouraged Tyler to reconsider the option of telling her parents about the baby and offered to help Tyler do so. Tyler declined. When asked what would happen if her parents found out later, Tyler said she expected Heszler and Huntziker to maintain confidentiality, and she did not see any way her parents would find out.
 

 Heszler brought up the possibility of Tyler raising the child by herself, but Tyler insisted she would not do anything that would mean her parents would find out about the baby.
 

 Heszler and Tyler discussed the possibility of Tyler and Darrah getting married and raising the child together. Tyler said she and Darrah had talked about that at great length but decided it was not possible. They were both college freshmen who intended to complete their education, and they were not in a position to give the baby what they wished her to have.
 

 At Tyler’s request, the baby was placed in foster care.
 

 Heszler gave Tyler blank copies of a “Statement of Understanding” and relinquishment forms to take home, advising that they were not to be signed but Tyler should review them because she would be signing similar forms if she decided to proceed with adoption.
 

 The Statement of Understanding begins as follows: “Relinquishing a child means permanently giving the child to the adoption agency so the agency can choose other parents to adopt the child. You permanently give up the child to the adoption agency by signing this Statement of Understanding and the Relinquishment document. You will no longer have any rights as a parent to your child once these documents have been filed with the State
 
 *524
 
 Department of Social Services, Adoptions Branch.” The Statement of Understanding contains specific information material to the decision to relinquish, as we discuss below.
 

 On April 25th, Heszler mailed to Darrah copies of relevant forms, including a Statement of Understanding for “alleged fathers,”
 
 [5]
 
 the relinquishment form, and a memorandum telling him the documents were for his review and inviting him to call with any questions.
 

 On April 27th, Tyler told Heszler that Tyler and Darrah had chosen a prospective adoptive family from an album of photographs and resumes previously provided by Hesler.
 

 On Wednesday, May 1, 1991, plaintiffs met at Central Park in Davis with Heszler and the prospective adoptive parents. This first meeting, which was somewhat strained, lasted about 50 minutes. This was Heszler’s first meeting with Darrah. Darrah said he loved the baby but there was no way he and Tyler could provide for her because they were both college freshmen who needed to complete their education.
 

 After a second meeting with the prospective adoptive parents on May 3d, Tyler reported to Heszler that she and Darrah were certain they wanted to place the baby with the couple. Tyler said she and Darrah wanted to proceed with the relinquishment the following day, Saturday, because Darrah would be returning to San Diego on Sunday. Tyler rejected Heszler’s suggestion that plaintiffs give themselves one more day to think about it.
 

 On Saturday, May 4th, plaintiffs met at the DCPC office with Heszler, Huntziker, the prospective adoptive family, the foster parents, and the baby. Tyler presented flowers to Huntziker, the foster mother, and the prospective adoptive mother.
 

 
 *525
 
 Heszler took plaintiffs into a private room and told them they would be asked to answer the following questions in front of the witnesses to the execution of the relinquishment documents: (1) “[H]ave you read this relinquishment and are you aware of what you are signing”; (2) “are you aware that when this signed relinquishment is filed with the State Department of Social Services by [CHS] all your rights to the custody, service, and earnings of this child and any responsibility for the care and support of this child will be terminated and that the child cannot be reclaimed by you”; and (3) “are you signing this relinquishment of your own free will.” Plaintiffs listened and had no questions.
 

 Heszler then called in the foster parents to witness execution of the documents. Heszler asked the questions she had previewed with plaintiffs, and plaintiffs responded affirmatively. Heszler asked if plaintiffs had read the Statement of Understanding. They said they had. Heszler had plaintiffs reread the Statement of Understanding to themselves and initial the boxes next to each paragraph to reflect their understanding of the information contained in each paragraph. The Statement of Understanding called for the parent to choose between immediate filing of the relinquishment or a hold of up to 30 days. Heszler told plaintiffs they had this option. Plaintiffs chose immediate filing. Heszler told plaintiffs they had one full working day— until 5 p.m. Monday—to change their mind and revoke the relinquishments. Plaintiffs signed the forms. The process took 15 or 20 minutes. Plaintiffs were tearful, as they had been at times throughout the process, but Heszler considered that to be normal emotion at relinquishing a baby. Neither Heszler nor the foster parents observed any indication that plaintiffs felt coerced or pressured into signing.
 

 The child was turned over to the prospective adoptive parents.
 

 The relinquishment forms were filed with DSS on Tuesday, May 7, 1991.
 

 On May 30, 1991, Tyler gave the prospective adoptive mother a Mother’s Day card, signed by Tyler and Darrah, on which Tyler had handwritten: “Thank you so much for giving Michelle exactly what we want for her, loving parents. Happy Mother’s Day!”
 

 Several months later, in mid-September 1991, Tyler told her parents about the baby. Darrah also told his parents in the fall of 1991. Tyler’s parents told her there must be something she could do to get the baby back. On September 14, 1991, Tyler telephoned Heszler and said she (Tyler) had made a mistake and wanted to get the baby back. Heszler said it was too late to revoke but sent forms to request rescission. Tyler submitted a formal request for rescission, which was denied by CHS.
 

 
 *526
 
 On October 29, 1991, plaintiffs filed this contract action for (1) rescission of the relinquishment agreements, on the grounds of fraud, coercion and undue influence, (2) intentional infliction of emotional distress, and (3) punitive damages.
 

 The trial court ordered a stay of the pending adoption proceedings.
 
 [6]
 

 At trial, in addition to their accusations of coercion and intimidation, plaintiffs asserted Heszler and CHS violated DSS regulations governing relinquishment of children for adoption by failing to (1) give plaintiffs full counseling, (2) give plaintiffs copies of the signed and filed forms, and (3) obtain a full medical history from Darrah. Heszler admitted noncompliance in that she did not discuss the option of placing the baby with extended family members, did not discuss educational or employment resources, did not give plaintiffs copies of the executed documents, and did not obtain Darrah’s medical history before the relinquishments were signed. We discuss the specific regulations,
 
 post.
 

 Following a three-week bench trial, the trial court found in favor of defendants. The court issued a written 11-page “Opinion and Ruling,”
 
 [7]
 
 finding that Heszler is an “ethical, principled, and experienced professional,”
 
 [8]
 
 that plaintiffs’ relinquishments for adoption were not procured by “fraud, coercion or undue influence,” and that the relinquishments for adoption were “voluntarily, intelligently and knowingly” given by both plaintiffs, who “are intelligent and strong minded.” The trial court believed plaintiffs loved the baby but made the difficult decision to relinquish her due to their difficult personal circumstances. “The Court believes that the Plaintiffs came to believe that they made a mistake, that they decided finally to tell their parents and when they received (perhaps unexpectedly) support from their parents they decided to seek to regain their child.”
 

 
 *527
 
 The trial court concluded the regulatory violations were of “limited relevance” because “minor deviations ... are insignificant, absent fraud or wrongful conduct. . . .”
 

 The court entered judgment in favor of defendants. Plaintiffs appeal.
 

 Discussion
 

 Plaintiffs contend Heszler and CHS failed to comply with mandatory DSS regulations applicable to private agency adoptions, and the failure of an adoption agency to comply with mandatory state regulations in obtaining relinquishments of parental rights renders the relinquishments void. Plaintiffs’ position is not entirely clear. They appear to advocate automatic rescission for
 
 any
 
 regulatory violation, yet they also appear to agree with the notion that insignificant violations need not result in rescission.
 

 We stress that, given the procedural posture of this case, this appeal does not present issues of deliberate misconduct by defendants. Rather, the issue here is at most negligent omissions of regulatory requirements.
 

 We will conclude noncompliance with the regulations does not automatically vitiate a relinquishment. However, noncompliance will constitute a ground for rescission of a relinquishment, regardless of the lack of fraudulent intent, if the noncompliance rises to the level of constructive fraud, i.e., if the violation causes prejudice to the relinquishing parents by affecting their decision to relinquish. Here, however, plaintiffs fail to show constructive fraud.
 

 I.
 
 The Relinquishment Process
 

 At the time plaintiffs signed their relinquishments, the process was governed by former Civil Code section 221 et seq.
 
 [9]
 
 Former Civil Code section 224m (Stats. 1980, ch. 1229, § 1, p. 4152, repealed by Stats. 1990, ch. 1363, § 2, operative July 1, 1991) provided in part: “The father or mother may relinquish a child to a licensed adoption agency for adoption by a written statement signed before two subscribing witnesses and acknowledged before an authorized official of an organization licensed by the State Department of
 
 *528
 
 Social Services to find homes for children and place children in homes for adoption. . . . [¶] The filing of the relinquishment with the department shall terminate all parental rights and responsibilities with regard to the child.”
 

 The relinquishment process was and is subject to regulations (Cal. Code Regs., tit. 22, § 35128 et seq.) adopted by DSS pursuant to legislative authority. (Welf. & Inst. Code, § 10553;
 
 [10]
 
 see now Fam. Code, § 8621,
 
 [11]
 
 operative Jan. 1, 1995 [department shall adopt regulations].)
 

 The effect of a relinquishment of a child by a birth parent is to allow adoption of the child without further consent of the birth parent. (Fam. Code, § 8606.)
 

 Once a relinquishment is filed with DSS, it is final and cannot be rescinded except under narrow circumstances. By statute: “. . . Upon filing with the department, the relinquishment is final and may be rescinded only by the mutual consent of the adoption agency and the parent or parents relinquishing the child. . . .” (Former Civ. Code § 224m, repealed by Stats. 1990, ch. 1363, § 2, operative July 1, 1991.)
 
 [12]
 
 Similarly, the regulations provide: “A relinquishment which has been filed with the department shall be rescinded only as specified at Civil Code Section 222.10.” (Cal. Code Regs., tit. 22, § 35167.) Civil Code section 222.10, which was repealed and replaced by Family Code section 8700 (Stats. 1992, ch. 162, § 10), provided at the time in question: “. . . Upon filing with the department, the relinquishment is final and may be rescinded only by the mutual consent of the adoption agency and the birth parent or parents relinquishing the child. . . .” (Stats. 1990, ch. 1363, § 3.)
 

 Nevertheless, California courts have long held that a birth parent may bring an action in equity to set aside a relinquishment for cause, such as fraud or undue influence.
 
 (In re Cheryl E., supra,
 
 161 Cal.App.3d at pp. 598-602 [substantial evidence supported trial court’s finding of undue influence where adoption worker misrepresented duration of revocation rights
 
 *529
 
 and told plaintiff if she did not sign relinquishment the child might be given to plaintiff’s estranged husband];
 
 Brooks
 
 v.
 
 Los Angeles County Bureau of Adoptions
 
 (1963) 218 Cal.App.2d 732 [32 Cal.Rptr. 466] [statute did not negate independent rule of equity allowing rescission for cause].)
 

 However, the contract of relinquishment cannot be rescinded when it appears that consent would have been given and the contract entered into notwithstanding the fraud or undue influence
 
 (In re Cheryl E., supra,
 
 161 Cal.App.3d at p. 600 [trial court implicitly found parent would not have relinquished child but for misrepresentations of adoption worker].) The granting or withholding of equitable relief is a matter within the discretion of the trial court.
 
 (Fairchild
 
 v.
 
 Raines
 
 (1944) 24 Cal.2d 818, 826 [151 P.2d 260].)
 

 “Relinquishments, once executed, must be relied upon in order to insure that children will not be forced out of one home and into another at the whims and caprice of emotionally upset and perhaps ill-advised persons. The state has expressed a strong policy in the necessity for giving effect to relinquishments, for to do otherwise would ‘open the door to practices which could conceivably discourage adopting parents from opening their hearts and homes to unwanted children . . . .’ [Citation.]”
 
 (Hall
 
 v.
 
 Department of Adoptions
 
 (1975) 47 Cal.App.3d 898, 903 [121 Cal.Rptr. 223] [coercion by child’s father would not constitute ground for child’s mother to rescind relinquishment unless adoption worker knew or should have known mother’s consent was not freely and voluntarily given]; see also,
 
 Adoption of Graham
 
 (1962) 58 Cal.2d 899 [27 Cal.Rptr. 163, 377 P.2d 275] [policy of state to maintain integrity of relinquishments];
 
 Adoption of Barnett
 
 (1960) 54 Cal.2d 370, 377 [6 Cal.Rptr. 562, 354 P.2d 18].) Adoption requirements “are to be liberally construed in order to effect the object of the adoption statutes in promoting the welfare of children, bereft of the benefits of the home and care of their real parents . . . .”
 
 (San Diego County Dept. of Pub. Welfare
 
 v.
 
 Superior Court
 
 (1972) 7 Cal.3d 1, 16 [101 Cal.Rptr. 541, 496 P.2d 453], internal quotation marks omitted.)
 

 II.
 
 Asserted Regulatory Violations
 

 Plaintiffs assert defendants violated various regulations. As to some of the regulations, the record shows the evidence was conflicting as to whether there was compliance. Where there is a conflict, we will infer findings in favor of the judgment, because no statement of decision was requested.
 
 (In re Marriage of Arceneaux
 
 (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].)
 

 
 *530
 
 A.
 
 Section 35129—Face-to-face
 
 Interview
 
 [13]
 

 Darrah complains that as to him defendants failed to comply with section 35129, which provides in part: “The agency shall provide a minimum of two face-to-face interviews with parents who are considering relinquishment and who reside in California. [¶] (1) The required interviews shall be provided over a period of two or more days . . . . [¶] (3) During the interview the agency shall explain to the parent the purpose of the agency and the services it provides.”
 

 Heszler testified she complied with this regulation by meeting with Darrah twice—on May 1st at the park and on May 4th when the relinquishments were signed.
 

 Darrah suggests the May 4th meeting does not count because both interviews must occur before the meeting to sign the documents. However, nothing in the regulation so requires.
 

 Darrah also contends the May 1st meeting does not count, because it lasted only 50 minutes, was held in a public park, and the prospective adoptive parents were present the whole time. Darrah thus challenges the quality of a meeting as an “interview.” However, the regulation does not specify requirements as to location or duration of the meeting, nor does the regulation restrict who else may be present.
 

 Plaintiffs fail to show any violation of section 35129.
 

 B.
 
 Sections 35133 and 35134—Counseling
 

 Plaintiffs complain they did not receive counseling required by sections 35133 and 35134.
 

 Section 35133 provides: “Prior to accepting the parent’s relinquishment of the child for adoption, the agency shall provide counseling as appropriate to the category of parents as described at Section 35134 who reside in California.”
 

 Section 35134 lists specific information that must be conveyed to parents, with certain requirements for mothers and “presumed fathers” (§ 35134, subd. (a)), and different requirements for “alleged fathers” (§ 35134, subd. (e)).
 

 
 *531
 
 Thus, the requirements differ for Tyler (as the mother) and Darrah (as the alleged father). On appeal, plaintiffs improperly ignore the distinction between the two subdivisions, inasmuch as they do not challenge defendants’ characterization of Darrah as an alleged father. (Fn. 5,
 
 ante.)
 

 We turn now to plaintiffs’ specific complaints regarding the counseling requirements.
 

 1.
 
 Legal Counsel
 

 First, plaintiffs claim defendants failed to comply with section 35134, which provides that “the agency shall . . . [¶] . . . [i]nform the parent that he/she has the right to seek legal counsel to assist him/her in the relinquishment process . . . [¶] . . . When appropriate the agency shall make referral to [legal resources].” (§ 35134, subd. (a)(2) [mother], subd. (e)(2) [alleged father].) Heszler admitted she did not verbally convey this information to plaintiffs, but it was contained in the Statements of Understanding.
 

 Thus, the Statements of Understanding both contained the following statement: “I understand I have the right to look for a lawyer to help me in the relinquishment process and the adoption agency can refer me to public legal help in my community.” Plaintiffs each initialed the box next to that statement.
 

 The regulations require that parents be provided with specific information in written form. (§ 35147.) Plaintiffs argue section 35134 must therefore require
 
 verbal
 
 counseling, because otherwise section 35137 would be superfluous. Merely handing someone a printed form, argue plaintiffs, cannot satisfy the purpose the regulations were designed to serve. However, this is not a case where a printed form was substituted for all human interaction. Assuming for the sake of argument that section 35134 requires verbal counseling, the omission of the verbal message regarding legal counsel was rendered harmless by the written Statement of Understanding. The right to legal counsel was stated in plain language. Plaintiffs are intelligent and strong-minded, as found by the trial court.
 

 Plaintiffs do not show they were unaware of the right to legal counsel or were prejudiced by the lack of verbal communication of this matter.
 

 To the extent plaintiffs suggest defendants were required to make an actual referral to legal services, the regulation requires only a referral “[w]hen appropriate.” (§ 35134, subd. (a)(2)(A) [mother]; subd. (e)(2)(A)
 
 *532
 
 [alleged father].) Plaintiffs fail to show the absence of a referral in this case constitutes a violation of the regulation.
 

 2.
 
 Alternative Plans
 

 Second, plaintiffs contend defendants violated section 35134, subdivision (a)(3), which requires the agency to “[p]rovide all available information regarding alternative plans for the child, with a complete description of each alternative, including keeping the child, placement with extended family members, and/or foster care and reunification services.”
 

 Plaintiffs incorrectly assert
 
 “None
 
 of this was done in this case.” (Original italics.)
 

 However, Heszler testified she did orally provide this information to Tyler, with the exception of (1) the extended family alternative, and (2) reunification services, which Heszler testified applies only in dependency cases. Thus, Heszler talked to Tyler about the possibility of marrying Darrah and raising the child, but Tyler said she and Darrah had discussed and rejected that option. Heszler talked to Tyler about getting help from Tyler’s parents, but Tyler was adamant that she did not want them to know about the baby and did not want Heszler to intercede in her behalf with her parents. Heszler talked to Tyler about raising the child on her own with the help of Aid to Families with Dependent Children (AFDC), but Tyler was not interested in AFDC and would not consider any option that might result in her parents finding out about the baby. Heszler talked to Tyler about foster care as a temporary resource, which in fact Tyler used.
 

 Heszler admitted she did not talk to Tyler about placing the baby with extended family members. However, under the circumstances of this case, this deficiency was not prejudicial, because Tyler was adamant that she would not choose any option that would lead to her parents finding out about the baby. The trial court found Tyler did not want her parents to find out and intentionally kept the baby a secret. Tyler cites nothing in the record to demonstrate she would have placed the baby with extended family members had defendants counseled her on this option.
 

 As to Darrah, the regulation addressing alleged fathers merely requires the agency to “[djiscuss the adoption plan for the child and determine if he wants to relinquish the child, assume parental responsibility for the child, place the child with extended family members, place the child in foster care and/or receive reunification services.” (§ 35134, subd. (e)(3).) Heszler discussed the adoption plan with Darrah and determined he wanted to relinquish the child. Assuming the regulation contemplates that the adoption
 
 *533
 
 worker will discuss the other options with the alleged father, no prejudice appears in this case, because the trial court found Darrah did not want his parents to find out about the baby. The other options would result in his parents finding out.
 

 No prejudice appears.
 

 3.
 
 Resources
 

 Third, plaintiffs contend defendants failed to comply with section 35134, subdivision (a)(4), which provides that the agency shall “[ijnform the parent of at least the following resources and make a referral when appropriate: [] Financial resources, [] Employment resources, [] Education resources, [] Child care resources, [] Housing resources, [and] Health service resources.”
 

 Heszler testified she talked to Tyler about the availability of AFDC, but Tyler was not interested. Heszler did not discuss employment resources because they did not seem applicable since Tyler stated her wish to continue as a student. Heszler did not talk about student loans or university housing. As to housing resources, Heszler talked to Tyler about getting an AFDC grant and moving off campus, which Tyler rejected. As to health services, Heszler provided no services but was aware Tyler was sent to a doctor, per arrangements made by Huntziker.
 

 Thus, defendants failed fully to comply with this regulation. However, plaintiffs fail to show prejudice. They do not cite anything in the record showing they would have decided against relinquishment had the omitted resources been explored.
 

 As to Darrah, the regulations regarding alleged fathers require that the agency “[d]iscuss the financial, health, and social service resources available if he wishes to consider assuming parental responsibility for the child.” (§ 35134, subd. (e)(4).) Here, the trial court disbelieved that Darrah ever wished to consider assuming parental responsibility for the child.
 

 No prejudice appears.
 

 4.
 
 Counseling Regarding Feelings
 

 Fourth, plaintiffs contend defendants failed to comply with section 35134, subdivision (a)(5), which requires the agency to “[p]rovide counseling services as needed to assist the parent with his/her feelings regarding the
 
 *534
 
 child and the long-range implications of relinquishing the child for adoption.” The same requirement applies to alleged fathers. (§35134, subd. (e)(6).)
 

 However, this regulation on its face confers discretion on the adoption worker to determine what counseling is needed. Heszler testified she did comply with this regulation by talking to Tyler about her feelings, her grief reaction, the finality of the decision, and the fact that it was the hardest decision to make in life. Heszler did not believe further counseling was required or would benefit Tyler. Tyler fails to demonstrate that Heszler’s exercise of discretion constitutes a violation of the regulation. Darrah fails to show he needed counseling or was prejudiced by any lack of counseling regarding his feelings. That plaintiffs cried while signing the relinquishments does not establish prejudice; as Heszler testified, sadness is a normal emotion during a relinquishment.
 

 Moreover, the long-range implications of relinquishment were also fully set forth in the written Statements of Understanding signed by plaintiffs. Thus, the documents stated plaintiffs’ understanding that by relinquishing the child, they would “no longer be responsible for the care of my child,” would “no longer have any right to the custody, services or earnings of my child,” and after adoption “all inheritance rights from any blood relatives will end unless they have made arrangements . . . .” The documents also told plaintiffs they had five years to seek rescission “if I think I was forced to sign or deliberately not told the truth about giving up my child.”
 

 No violation of the regulation is shown.
 

 5.
 
 Independent Adoption
 

 Fifth, plaintiffs contend defendants failed to comply with section 35134, subdivision (a)(6), which requires the agency to “[a]dvise the parent of the option of an independent adoption.” No similar provision appears under the subdivision addressing alleged fathers. (§ 35134, subd. (e).)
 

 Heszler testified she did not verbally advise Tyler about independent adoption because it was apparent Tyler already knew about it.
 
 [14]
 
 Additionally, the Statement of Understanding signed by Tyler contains the following provision, with her initials next to it: “6.1 understand if I decide not to give up my child to the adoption agency, I can place my child for adoption with
 
 *535
 
 parents I find myself and agree only to an adoption of my child by these parents; this is called an Independent Adoption.” We note Darrah’s Statement of Understanding contained a similar statement, with the qualification that he would first have to prove paternity in court and obtain physical custody of the child.
 

 Plaintiffs suggest the significance of the distinction between independent adoption and agency adoption was not explained, i.e., that a parent typically has more time to change his or her mind with independent adoption. However, there was no prejudice, because plaintiffs were offered the option of delaying the effectiveness of the relinquishment for up to 30 days but chose not to do so. Thus, the Statements of Understanding said: “I understand I have the following filing choices when I sign this Statement of Understanding and relinquishment document: [¶] A. I may choose to have the adoption agency file my relinquishment form immediately. If so, I may take it back any time before the close of the next working day after I sign the form; or [¶] B. I may choose to have the adoption agency hold the relinquishment form for up to 30 days so I can think about my decision. I understand my child will not be placed for adoption during any holding period . . . .” At the meeting to sign the documents, Heszler told plaintiffs the option was available. Plaintiffs selected the option: “I want the relinquishment form filed immediately.” As reflected by the evidence, it was Tyler’s idea to proceed quickly so as to allow the baby to bond with adoptive parents.
 

 Since plaintiffs chose not to avail themselves of a 30-day hold, they cannot show any causal connection between the asserted noncompliance and their decision to relinquish.
 

 No prejudice appears from violation of section 35133 or 35134.
 
 [15]
 

 C.
 
 Section 35135—Assurance of Counseling
 

 Plaintiffs contend defendants failed to comply with section 35135, which provides in part: “(a) Prior to accepting the parent’s relinquishment of
 
 *536
 
 a child for adoption, the agency shall determine: [¶] (1) That the parent has chosen the plan of adoption for the child and freely chooses to relinquish the child. ... [¶] (4) That the parent, if residing in California, has received required counseling as appropriate to the category of parents commencing with Section 35134. . . .”
 

 As we have seen, Heszler testified she determined the required counseling had been received by plaintiffs. Heszler also testified she determined plaintiffs had chosen the adoption plan and had freely chosen to relinquish the child. Additionally, the foster parents who witnessed execution of the relinquishment documents testified that plaintiffs verbally affirmed they understood the documents and were acting voluntarily, and that plaintiffs appeared to know what they were doing and to be doing it freely. Plaintiffs fail to show a violation of section 35135.
 

 D.
 
 Section 35141—Effective Date
 

 Plaintiffs contend defendants failed to comply with section 35141, which provides the “agency representative shall inform all parents: [¶] (1) Of the time frame options for the filing of the signed relinquishment form with the department, [¶] (A) The parent shall be permitted to request that the signed relinquishment form be filed without a holding period, [¶] (B) The parent shall be permitted to have the signed relinquishment form held for a specified period of up to 30 days before the agency submits it to the department for filing. . . .”
 

 Plaintiffs erroneously assert this regulation allows an “indefinite” hold. The indefinite hold applies only where there are unresolved questions about custody rights of other parents not involved in the relinquishment. (§ 35141, subd. (a)(2).)
 

 Plaintiffs assert they were never advised of the option to put a hold on the relinquishments. However, although plaintiffs testified to that effect (indeed testified Heszler told them the hold option was no longer available), Heszler testified she did advise plaintiffs of this option when they met to sign the forms. We presume the trial court believed Heszler’s testimony.
 

 Plaintiffs fail to demonstrate a violation.
 

 E.
 
 Section 35151—Copies of Signed Documents
 

 Plaintiffs contend defendants failed to comply with section 35151’s provision that upon signing of the forms the agency must “[g]ive the parent
 
 *537
 
 a copy of the completed relinquishment document” (§ 35151, subd. (a)(3)(D).) Heszler admitted she inadvertently omitted to give plaintiffs copies of the signed documents. Plaintiffs did not receive their copies until four months later. Plaintiffs claim this omission was crucial because only by taking the documents home could plaintiffs have a fair opportunity to review the documents privately and carefully so as to invoke their option to revoke within the 24-hour period.
 

 However, events subsequent to the signing cannot be used to demonstrate that the signing itself was tainted. Moreover, plaintiffs had previously received copies of the documents, which presumably were still in their possession. Finally, the trial court found plaintiffs knew they had more than 24 hours to change their mind, but they chose not to do so.
 

 No prejudice appears.
 

 F.
 
 Section 35153—Copies of Filed Documents
 

 Plaintiffs complain defendants failed to comply with section 35153, subdivision (a)(6), which requires that the agency “[sjend the parent a copy of the filed relinquishment form,” after it is filed with DSS. Heszler admitted this was not done. For the reasons we have already stated with regard to the failure to provide copies of signed documents, no prejudice appears.
 

 G.
 
 Section 35169—Rescission Procedures
 

 Plaintiffs contend defendants failed to comply with section 35169, which sets forth procedures the agency must follow when it receives a request for rescission of a relinquishment. However, events which occurred after the signing of the relinquishment cannot be used to demonstrate the signing was not knowing and voluntary.
 

 H.
 
 Civil Code Section 222.26—Medical History
 

 Plaintiffs contend defendants failed to comply with former Civil Code section 222.26,
 
 [16]
 
 requiring the agency to obtain medical histories from relinquishing parents. The portion of the transcript cited by plaintiffs indicates the agency did not obtain Darrah’s medical history. However, the
 
 *538
 
 purpose of this requirement is not to protect relinquishing parents but “to provide the prospective adopting parents with the kinds of information which may reasonably influence their decision whether to adopt the child.”
 
 (Adoption of Kay C.
 
 (1991) 228 Cal.App.3d 741, 752 [278 Cal.Rptr. 907].) Thus, noncompliance does not prejudice the relinquishing parents.
 
 [17]
 

 To recap, defendants violated the DSS regulations in that they (1) failed to discuss the option of placing the baby with extended family members, (2) failed to discuss educational or employment resources, (3) failed to give plaintiffs copies of the executed documents, and (4) failed to obtain Darrah’s medical history.
 

 The crucial question in this case is whether these regulatory violations warrant rescission of the relinquishments despite the absence of prejudice to plaintiffs. Plaintiffs argue regulatory violations automatically vitiate the relinquishments without regard to prejudice. As will appear, we will reject plaintiffs’ position as overbroad but will conclude regulatory violations provide a basis for rescission of relinquishments under the doctrine of constructive fraud if a relinquishing parent is misled to his or her prejudice by the adoption agency’s violation of regulations.
 

 III.
 
 Noncompliance With Regulations Does Not Automatically Vitiate Relinquishment
 

 Plaintiffs contend noncompliance with the DSS regulations automatically vitiates the relinquishments under principles of administrative and constitutional law. We will conclude the contentions are without merit.
 

 A.
 
 Administrative Law
 

 Neither the statutes nor the regulations provide that noncompliance with the regulations renders a relinquishment void. Nevertheless, plaintiffs argue noncompliance with the regulations automatically invalidates the relinquishments because administrative regulations have the force and effect of law, and an agency’s failure to follow the law, i.e., the administrative regulations, invalidates agency action. We disagree.
 

 
 *539
 
 “[A] regulation adopted by a state administrative agency pursuant to a delegation of rulemaking authority by the Legislature has the force and effect of a statute. [Citations.]”
 
 (Agricultural Labor Relations Bd.
 
 v.
 
 Superior Court
 
 (1976) 16 Cal.3d 392, 401 [128 Cal.Rptr. 183, 546 P.2d 687].)
 

 However, the general proposition that regulations have the force of statute does not mean that any departure from the regulations automatically invalidates the action taken.
 

 Thus, “[traditionally, the question of whether a public official’s[
 
 18
 
 ] failure to comply with a statutory procedure should have the effect of invalidating a subsequent governmental action has been characterized as a question of whether the statute should be accorded ‘mandatory’ or ‘directory’ effect. If the failure is determined to have an invalidating effect, the statute is said to be mandatory; if the failure is determined not to invalidate subsequent action, the statute is said to be directory. . . . [I]n evaluating whether a provision is to be accorded mandatory or directory effect, courts look to the purpose of the procedural requirement to determine whether invalidation is necessary to promote the statutory design.”
 
 (People
 
 v.
 
 McGee
 
 (1977) 19 Cal.3d 948, 958-959 [140 Cal.Rptr. 657, 568 P.2d 382]; see also
 
 Morris
 
 v.
 
 County of Marin
 
 (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606];
 
 People
 
 v.
 
 Harner
 
 (1989) 213 Cal.App.3d 1400, 1405-1406 [262 Cal.Rptr. 422].) “Many statutory provisions which are ‘mandatory’ in the obligatory sense are accorded only ‘directory’ effect.”
 
 (People
 
 v.
 
 McGee, supra,
 
 19 Cal.3d at p. 959 [reversing conviction for welfare fraud due to government’s failure first to seek restitution, as required by statute].)
 

 “[T]here is no simple, mechanical test for determining whether a provision should be given ‘directory’ or ‘mandatory’ effect. ‘In order to determine whether a particular statutory provision ... is mandatory or directory, the court, as in all cases of statutory construction and interpretation, must ascertain the legislative intent. In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose [citation] ....’”
 
 (Morris
 
 v.
 
 County of Marin, supra,
 
 18 Cal.3d at pp. 909-910, fn. omitted.)
 

 
 *540
 
 Here, the manifest overall purpose of the regulations is to assure that relinquishments are given voluntarily and knowingly. However, we do not deal in this case with a wholesale disregard of the regulations but rather with partial noncompliance involving details such as failure to (1) discuss the option of placing the child with extended family members, (2) discuss educational and employment resources, (3) give copies of executed documents to plaintiffs, and (4) obtain the father’s medical history. Under these circumstances, automatic invalidation of the relinquishments is not necessary to further the purpose of assuring voluntary and knowing decisionmaking by the parents. That purpose is served by a rule of substantial compliance, which means “actual compliance in respect to the substance essential to every reasonable objective” of the provisions.
 
 (Stasher
 
 v.
 
 Harger-Haldeman
 
 (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649], italics omitted;
 
 Bayside Auto & Truck Sales, Inc.
 
 v.
 
 Department of Transportation
 
 (1993) 21 Cal.App.4th 561, 568 [26 Cal.Rptr. 109].) As we discuss
 
 post,
 
 the relinquishing parents have an adequate remedy through rescission for constructive fraud if regulatory violations cause an involuntary or unknowing relinquishment.
 

 We cannot agree with plaintiffs that the integrity of the adoption process compels strict adherence to the regulations to the extent that nonprejudicial violations would vitiate relinquishments. In
 
 Adoption of Barnett, supra,
 
 54 Cal.2d 370, a county bureau of adoptions sought to vacate an adoption by a single parent, who had been married at the time of the natural mother’s formal consent to adoption but who was subsequently divorced before the adoption was granted by the court. The natural mother had given
 
 informal
 
 consent upon learning of the divorce.
 
 (Barnett, supra,
 
 54 Cal.2d at p. 374.) The bureau argued (1) the formal consent in favor of the married couple did not constitute consent in favor of the single parent, and (2) the informal consent, which was expressed in letters written by the natural mother to the divorced woman, was invalid because it did not comply with a statutory requirement that a consent be signed on a form prescribed by the department and witnessed by a department representative or notary public.
 
 (Barnett, supra,
 
 54 Cal.2d at p. 376.)
 

 The Supreme Court affirmed the order of adoption, stating “[t]he manifest overall purpose of the requirements . . . is to prove that the natural mother’s written declaration of consent to the adoption actually was knowingly and freely signed by her. Here that purpose is fully accomplished; there is no question that the natural mother . . . freely and formally consented to adoption by [the married couple] and there is no question but that thereafter, with knowledge of [the divorce], the natural mother, by letters from Nebraska, willingly and knowingly consented to adoption by [the divorced
 
 *541
 
 woman] alone.”
 
 (Adoption of Barnett, supra,
 
 54 Cal.2d at p. 379.) The court also stated adoption laws should be liberally construed to sustain, rather than defeat, their main objective of promoting the welfare of children.
 
 (Barnett, supra,
 
 54 Cal .2d at p. 377.)
 

 We recognize
 
 Barnett
 
 is not directly on point because it was an adoption proceeding rather than a rescission action. It has been said that the best interests of the child are not at issue in an action to rescind relinquishment of a child for adoption.
 
 {In re Cheryl E., supra,
 
 161 Cal.App.3d at p. 603.) Nevertheless, although the child’s best interests are not directly at issue, we believe the principle of liberal construction applies to relinquishments as part of the body of adoption laws.
 

 Thus, the Supreme Court has said: “[T]he filing of a certified copy of the relinquishments with the [department] establishes rights which thereafter cannot be involuntarily withdrawn. The legislative scheme for the placement of relinquished children contemplates that the statutory proceedings will progress unhampered by extrinsic matters and with assurance that proper proceedings may consummate a valid adoption.”
 
 {Adoption of Graham, supra,
 
 58 Cal.2d at p. 906.) Neither the statutes nor the regulations provide invalidation of relinquishments as a penalty for the agency’s violation of the regulations. To the contrary, the statutes and regulations express the policy in favor of upholding the validity of relinquishments by providing relinquishments are final upon filing. (Fam. Code, § 8700, subd. (d); § 35167.)
 

 We therefore conclude an adoption agency’s violation of DSS regulations does not automatically invalidate relinquishments.
 

 Plaintiffs cite
 
 Morton
 
 v.
 
 Ruiz
 
 (1974) 415 U.S. 199, 235 [39 L.Ed.2d 270, 294, 94 S.Ct. 1055] for the proposition that an administrative agency’s failure to follow its own regulations will invalidate agency action. Plaintiffs quote from that case: “Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.”
 
 {Id.
 
 at p. 235 [39 L.Ed.2d at p. 294].) As an agent of the state, say plaintiffs, CHS was obliged to follow DSS regulations upon penalty of invalidation of the relinquishments. However,
 
 Morton
 
 v.
 
 Ruiz
 
 is distinguishable.
 

 In
 
 Morton
 
 v.
 
 Ruiz,
 
 Native Americans living off the reservation but in a Native American community near the reservation applied for general assistance benefits from the Bureau of Indian Affairs (BIA). BIA denied benefits under a rule in its internal operations manual limiting eligibility to Native Americans living “on reservations.” (415 U.S. at pp. 204, 235 [39 L.Ed.2d at pp. 277, 294].) The United States Supreme Court held BIA could not deny benefits to Native Americans who lived in a Native American community
 
 *542
 
 near their native reservation, and who maintained close economic and social ties with the reservation and had not been assimilated into general society. (415 U.S. at pp. 211 [39 L.Ed.2d at pp. 280-281].) In budget requests, BIA had led Congress to believe the appropriations were for Native Americans on or near the reservations. (415 U.S. at pp. 229-230 [39 L.Ed.2d at pp. 290-291.) In dictum, the high court determined BIA could not rely on its internal operations manual’s limitation of eligibility to Native Americans “on reservations,” because BIA had failed to publish these eligibility restrictions in the Federal Register or in the Code of Federal Regulations, as required by the federal Administrative Procedure Act (APA). (415 U.S. at pp. 232-235 [39 L.Ed.2d at pp. 292-294].) The APA itself contained a sanction that persons could not be adversely affected by matter required to be published and not so published.
 
 {Id.
 
 at p. 233 [39 L.Ed.2d at p. 293].) Additionally, denial of benefits under the circumstances would be inconsistent with “ ‘the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.’ ”
 
 {Id.
 
 at p. 236 [39 L.Ed.2d at pp. 294-295.)
 

 Thus,
 
 Morton
 
 v.
 
 Ruiz
 
 applied a statutory sanction under federal administrative law. Here, plaintiffs cite no state administrative law imposing a similar sanction. Moreover,
 
 Morton
 
 v.
 
 Ruiz
 
 “is best understood in its unique factual context. The unfairness of BIA’s sequence of actions at issue in
 
 Ruiz
 
 presented an unusually compelling case in the context of native Americans with whom the United States has a special trust relationship.”
 
 [19]
 
 (1 Davis & Pierce, Administrative Law Treatise (3d ed. 1994) § 6.5, p. 254; see also,
 
 Ali
 
 v.
 
 Reno
 
 (S.D.N.Y. 1993) 829 F.Supp. 1415, 1427.)
 

 Plaintiffs cite
 
 Hock Investment Co.
 
 v.
 
 City and County of San Francisco
 
 (1989) 215 Cal.App.3d 438 [263 Cal.Rptr. 665]. There, an apartment house owner alleged it submitted an application for condominium conversion before adoption of a new restrictive ordinance and in reliance on a department of public works order promising that applications would be evaluated under the ordinance in effect on the date of the submittal. The appellate court held the trial court abused its discretion in sustaining a demurrer where it appeared the plaintiff could state a cause of action based on estoppel if the plaintiff reasonably relied on that promise to its significant detriment.
 
 {Id.
 
 at pp. 444, 449.) Thus,
 
 Hock
 
 does not support plaintiffs’ claim that regulatory violations automatically invalidate relinquishments.
 

 Plaintiffs also cite two cases for the following proposition: “If an agency in its proceedings violates its rules and prejudice results, any action taken as
 
 *543
 
 a result of the proceedings cannot stand.”
 
 (Scott
 
 v.
 
 Heckler
 
 (7th Cir. 1985) 768 F.2d 172, 178-179;
 
 Howard
 
 v.
 
 Heckler
 
 (N.D.Ill. 1986) 661 F.Supp. 654, 656.) However, this proposition, which on its face requires prejudice, does not support plaintiffs’ argument that defendants’ violation of DSS regulations automatically vitiates the relinquishments. Prejudice is required.
 

 Plaintiffs cite
 
 Adoption of Kay C., supra,
 
 228 Cal.App.3d 741, for its statement: “He who claims that an act of adoption has been accomplished must show that every essential requirement has been complied with.”
 
 (Id.
 
 at p. 750 [affirming order to set aside adoption at request of adoptive parents who had not been informed of minor’s borderline personality disorder].) However, no adoption is at issue in this case, since the trial court ordered a stay of the adoption proceedings. Moreover, the statement’s reference to “essential requirements” is consistent with our conclusion that nonprejudicial deviations from the regulations will not interfere with the adoption process.
 

 Plaintiffs also cite
 
 Matter of the Adoption of P.E.P.
 
 (1991) 329 N.C. 692 [407 S.E.2d 505] for its statement: “ ‘Considering the nature and great importance of the adoption of children into the home and family in comparison with most other transactions of life, it seems to us amazing that so little regard is often paid to the vital necessity of legality. The necessary steps are easy to understand and easy to observe, and only a fair degree of attention at the right time will serve to prevent frustration, disappointment and heartbreak.’ [Citation.] ffl] The procedural safeguards provided in the adoption statutes are not mere window dressing—they serve to protect the interests of the parties, the child, and the public.”
 
 (Id.
 
 at p. 511.)
 

 However,
 
 Matter of the Adoption of P.E.P., supra,
 
 did not hold regulatory violations automatically vitiated agency action. There, the Supreme Court of North Carolina invalidated an adoption proceeding because of “statutory violations [by the adoptive parents and their attorney], together with numerous other irregularities, under the circumstances of this case . . . .” (407 S.E.2d at pp. 511-512.) The court agreed with the proposition that “ ‘any single procedural aberration, looked at in isolation, may not appear to be sufficient to void the adoption. When
 
 viewed together,
 
 however, the defects in this case are substantial and serious enough’ ” to invalidate the adoption. (407 S.E.2d at p. 511, original italics.) The court also agreed the procedural irregularities in the case before it were apparently deliberate.
 
 (Ibid.)
 
 Among the defects were: (1) the adoptive parents’ attorney falsely advised the out-of-state expectant mother that she had to come stay in the same state as the adoptive parents; (2) the adoptive parents in effect “bought” the baby in violation of state law by paying money to and on behalf of the natural mother; and (3) the adoptive parents’ attorney failed to serve proper notice
 
 *544
 
 of proceedings on the natural father, even though the attorney was aware of the father’s identity and opposition to adoption.
 
 (Ibid.)
 

 Thus, the
 
 P.E.P.
 
 case does not support plaintiffs’ claim that noncompliance with DSS regulations automatically vitiates the relinquishments. It merely allows violations to be considered as a ground for invalidating action. We accord plaintiffs the same opportunity in this case.
 

 Plaintiffs claim prejudice is presumed from violation of the regulations. However, plaintiffs cite no authority to support their position.
 

 As we discuss
 
 post,
 
 prejudicial noncompliance does constitute grounds for rescission of relinquishments under the doctrine of constructive fraud. This provides a sufficient remedy for parents who allege regulatory violations, without doing violence to the policy in favor of upholding relinquishments.
 

 In their reply brief, plaintiffs for the first time argue that if this were a case about purchase of an automobile, “no one” would dispute that failure to comply with state regulations would invalidate the transaction. Plaintiffs argue parents deserve no less protection. We need not address this new argument, which is unsupported by authority. However, we point out that invalidation for noncompliance in the car sales context is a remedy expressly created by statute. (E.g., Civ. Code, § 2983.) Here, no statute or regulation calls for invalidation of a relinquishment due to noncompliance with DSS regulations.
 

 We conclude plaintiffs have failed to show that noncompliance with DSS regulations automatically voids relinquishments under principles of administrative law.
 

 B.
 
 Due Process
 

 Plaintiffs contend that because parenting is a constitutionally protected right and because relinquishment terminates parental rights, an adoption agency’s noncompliance with regulations constitutes a deprivation of procedural due process by an agent of the state.
 
 [20]
 
 According to plaintiffs, an agreement to relinquish a child for adoption must fail if the agency fails strictly to comply with the regulations. We disagree.
 

 
 *545
 
 The Fourteenth Amendment to the federal Constitution provides in relevant part: “. . . nor shall any state deprive any person of life, liberty, or property, without due process of law ....
 

 “Only those actions that may fairly be attributed to the state . . . are subject to due process protections. [Citations.]”
 
 (Coleman
 
 v.
 
 Department of Personnel Administration
 
 (1991) 52 Cal.3d 1102,1112 [278 Cal.Rptr. 346, 805 P.2d 300].) However, private conduct may become so entwined with governmental action as to become subject to the due process guarantees of the Fourteenth Amendment.
 
 (Adams
 
 v.
 
 Department of Motor Vehicles
 
 (1974) 11 Cal.3d 146, 152 [113 Cal.Rptr. 145, 520 P.2d 961].)
 

 Here, defendant CHS, as a licensed adoption agency, is fairly characterized as an agent of the state. Thus,
 
 Scott
 
 v.
 
 Family Ministries
 
 (1976) 65 Cal.App.3d 492 [135 Cal.Rptr. 430] held the state is entangled with licensed private adoption agencies such that the adoption agency is bound by regulations limiting what religious restrictions may be imposed on adoptive parents.
 
 (Id.
 
 at pp. 506-507.) The
 
 Scott
 
 court said: “The agencies are delegated the governmental case work function in the adoption process. The state delegates to them the process of investigation and reporting to the court that in nonagency adoptions must be performed by the [state]. The state delegates to the private licensed agencies the state’s power and obligation to select adoptive parents and to bar all others from the right to adopt the particular child. ... In essence if a private-licensed adoption agency imposes a [] restriction in exercising its delegated power and responsibility it is acting for and on behalf of the state when it does so. [¶] We thus conclude that Family Ministries is bound by our construction of [the California Code of Regulations] to the same extent as the state itself is bound.”
 
 (Ibid.)
 
 Similarly, we conclude defendant CHS, a licensed private adoption agency, is a governmental actor for purposes of due process analysis.
 

 Parenting is a fundamental right and “[n]o human bond is cemented with greater strength than that of parent and child.”
 
 (Michelle W.
 
 v.
 
 Ronald W.
 
 (1985) 39 Cal.3d 354, 357 [216 Cal.Rptr. 748, 703 P.2d 88] [paternity case];
 
 In re David C.
 
 (1984) 152 Cal.App.3d 1189, 1208 [200 Cal.Rptr. 115] [Civ. Code, § 232, proceeding to terminate parental rights due to neglect];
 
 In re Robert D.
 
 (1984) 151 Cal.App.3d 391 [198 Cal.Rptr. 801] [grandparent visitation rights].) Because parents enjoy a fundamental liberty interest in the care, custody and control of their children, parental rights cannot be terminated except according to procedures that satisfy due process.
 
 (Santosky
 
 v.
 
 Kramer
 
 (1982) 455 U.S. 745, 753-754 [71 L.Ed.2d 599, 606, 102 S.Ct. 1388].) At the same time, constitutional rights may generally be waived, provided the waiver is knowing, voluntary, and intelligent.
 
 (D. H. Overmyer Co.
 
 v.
 
 Frick Co.
 
 (1972) 405 U.S. 174, 185-186 [31 L.Ed.2d 124, 134, 92
 
 *546
 
 S.Ct. 775].) In particular, constitutional rights to a parent-child relationship may be waived as long as the waivers are “voluntary [citations] and knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.”
 
 (San Diego County Dept. of Pub. Welfare
 
 v.
 
 Superior Court, supra,
 
 7 Cal.3d 1, 10 , internal quotation marks omitted, citing
 
 In re Hannie
 
 (1970) 3 Cal.3d 520, 526 [90 Cal.Rptr. 742, 476 P.2d 110] [waiver of constitutional rights in criminal context]; see also
 
 Brady
 
 v.
 
 United States
 
 (1970) 397 U.S. 742, 748 [25 L.Ed.2d 747, 756, 90 S.Ct. 1463] [same].)
 

 Due process may require that certain procedures be followed to insure that a waiver of constitutional rights is accomplished knowingly, voluntarily, and intelligently. (See, e.g.,
 
 Isbell
 
 v.
 
 County of Sonoma
 
 (1978) 21 Cal.3d 61, 68-70 [145 Cal.Rptr. 368, 577 P.2d 188] [confession of judgment].) Here, plaintiffs argue the regulations (and each of them) specify the due process to which plaintiffs were entitled. At this point, we disagree.
 

 Constitutionally mandated requirements of procedural due process are found in the constitution, as interpreted by the courts, and not in state statutes.
 
 (Cleveland Bd. of Educ.
 
 v.
 
 Loudermill
 
 (1985) 470 U.S. 532, 541 [84 L.Ed.2d 494, 503, 105 S.Ct. 1487];
 
 Burrell
 
 v.
 
 City of Los Angeles
 
 (1989) 209 Cal.App.3d 568, 576-577 [257 Cal.Rptr. 427].)
 

 “[T]he mere fact that a state agency violates its own procedures does not,
 
 ipso facto,
 
 mean that it has contravened federal due process requirements.”
 
 (Morris
 
 v.
 
 City of Danville, Va.
 
 (4th Cir. 1984) 744 F.2d 1041, 1048, fn. 9.) “A failure to comply with state or local procedural requirements does not necessarily constitute a denial of due process; the alleged violation must result in a procedure which itself falls short of standards derived from the Due Process Clause. [Citations.]”
 
 (Mangels
 
 v.
 
 Pena
 
 (10th Cir. 1986) 789 F.2d 836, 838.) “An agency’s violation of its regulations is not unconstitutional unless the regulations are necessary to afford due process. [Citation.] When a property interest has been created, the due process clause, not state regulations, defines what process is constitutionally mandated. [Citations.]”
 
 (Bowens
 
 v.
 
 N.C. Dept. of Human Resources
 
 (4th Cir. 1983) 710 F.2d 1015, 1019; see also
 
 McDarby
 
 v.
 
 Dinkins
 
 (2d Cir. 1990) 907 F.2d 1334, 1337;
 
 Goodrich
 
 v.
 
 Newport News School Bd.
 
 (4th Cir. 1984) 743 F.2d 225 ;
 
 Bates
 
 v.
 
 Sponberg
 
 (6th Cir. 1976) 547 F.2d 325, 329-330.)
 

 Atencio
 
 v.
 
 Bd. of Ed. of Penasco Ind. Sch. Dist.
 
 (10th Cir. 1981) 658 F.2d 774 is instructive. There, plaintiff Atencio brought a civil rights action under 42 United States Code section 1983, claiming he had been denied procedural due process when he was discharged from his position as superintendent of schools. He contended the school district violated a statewide regulation that
 
 *547
 
 required two conferences with an employee’s supervisor prior to notice of discharge. The circuit court rejected the challenge, concluding the conference procedure was not required by due process and plaintiff was afforded due process when he was given notice and a hearing prior to discharge.
 
 (Atencio, supra,
 
 658 F.2d at p. 779.)
 

 Here, we conclude the procedures actually afforded plaintiffs were more than adequate to insure that their relinquishments of parental rights were given knowingly, voluntarily and intelligently. The regulations violated by defendants
 
 [21]
 
 were not necessary to insure a knowing, voluntary and intelligent waiver of parental rights and were therefore not required by constitutional guarantees of procedural due process. Rather, as a matter of legislative grace, these regulations required procedures not required by due process. (See
 
 Franchise Tax Board
 
 v.
 
 Superior Court
 
 (1950) 36 Cal.2d 538, 549 [225 P.2d 905] [Legislature provided hearing not required by due process].) In short, we conclude plaintiffs were afforded adequate procedural due process.
 
 [22]
 

 IV.
 
 Constructive Fraud
 

 Plaintiffs contend constructive fraud constitutes a ground for rescission without regard to fraudulent intent by defendants, and the trial court erred in failing to consider that theory. We agree constructive fraud constitutes a ground for rescission without regard to the intent of the defendants. We will conclude, however, that plaintiffs have waived the contention of the trial court’s failure to consider that theory because plaintiffs did not request a statement of decision. Since, as we have seen, the regulatory violations in this case were nonprejudicial, we will also conclude plaintiffs fail to show any abuse of discretion in the trial court’s denial of rescission on a constructive fraud theory.
 

 
 *548
 
 A.
 
 Constructive Fraud Is a Basis for Rescission
 

 Actual fraud
 
 [23]
 
 and undue influence
 
 [24]
 
 generally involve active misconduct, such as an intent to deceive, or misrepresentation, by the defendant. This appeal does not involve any misrepresentation or intent to deceive. As we have seen, the trial court found defendants to be ethical, principled professionals. Instead, this appeal involves at most negligent
 
 omissions
 
 by defendants in failing to comply with DSS regulations. Unlike fraud and undue influence, a constructive fraud claim allows relief for negligent omissions constituting breach of duty in a confidential relationship.
 

 Thus, by statute, “[c]onstructive fraud consists: [¶] 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another
 
 to his prejudice,
 
 or to the prejudice of anyone claiming under him; or, [¶] 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.” (Civ. Code, § 1573, italics added.) Constructive fraud “arises on a breach of duty by one in a confidential or fiduciary relationship to another which induces justifiable reliance by the latter
 
 to his
 
 prejudice.”
 
 (Odorizzi
 
 v.
 
 Bloomfield School Dist.
 
 (1966) 246 Cal.App.2d 123, 129 [54 Cal.Rptr. 533], italics added.) Actual reliance and causation of injury must be shown. (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 666, pp. 116-117, citing
 
 County of San Diego
 
 v.
 
 Utt
 
 (1916) 173 Cal. 554, 560 [160 P. 657].)
 

 Plaintiffs assert constructive fraud constitutes a ground for rescission in this case because adoption agencies are in a fiduciary relationship with relinquishing parents. However, plaintiffs cite no authority for the proposition that the relationship is a fiduciary one. A fiduciary is “a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.”
 
 *549
 
 (Rest.2d Agency, § 13, com. a;
 
 Destefano
 
 v.
 
 Grabrian
 
 (Colo. 1988) 763 P.2d 275, 284.) We thus agree with defendants that an adoption agency’s concurrent responsibilities to the other parties, the child and prospective adoptive parents, whose interests may potentially conflict with the birth parents, negate a fiduciary relationship with the birth parents.
 

 However, a relationship need not be a fiduciary one in order to give rise to constructive fraud. Constructive fraud also applies to nonfiduciary “confidential relationships.”
 
 (Odorizzi
 
 v.
 
 Bloomfield School Dist., supra,
 
 246 Cal.App.2d at p. 129.) “Such a confidential relationship may exist whenever a person with justification places trust and confidence in the integrity and fidelity of another.”
 
 (Ibid.,
 
 [bare allegation of employer-employee relationship insufficient to support confidential relationship].) “ ‘A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other’s interest in mind. A confidential relation may exist although there is no fiduciary relation ....’”
 
 (Davies
 
 v.
 
 Krasna
 
 (1975) 14 Cal.3d 502, 510 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807] [dictum].)
 

 The existence of a confidential relationship is generally a question of fact.
 
 (Barbara A.
 
 v.
 
 John G.
 
 (1983) 145 Cal.App.3d 369, 383-384 [193 Cal.Rptr. 422].) Here, plaintiffs contend a confidential relationship existed in this case because Tyler was in a weakened condition and placed trust in CHS because she believed she was dealing with the state, and both plaintiffs were young and inexperienced. We will assume for the sake of argument that a confidential relationship existed. (See
 
 In re Cheryl E., supra,
 
 161 Cal.App.3d at p. 601 [characterizing adoption agency’s relationship as a confidential one for undue influence purposes where relinquishing mother was in weakened state].)
 

 This does not, however, mean that
 
 any
 
 deviation from the regulations will invalidate the agreements to relinquish the child for adoption. Constructive fraud requires a showing that the plaintiff was misled to his or her prejudice. (Civ. Code, § 1573;
 
 Odorizzi
 
 v.
 
 Bloomfield School Dist., supra,
 
 246 Cal.App.2d at p. 129.)
 

 As indicated, plaintiffs argue the law presumes prejudice from violation of the regulations, but they cite no authority to support their position. Instead, their sole reliance on a presumption of prejudice highlights the absence of actual prejudice in this case.
 

 Plaintiffs also argue it was not their burden to prove prejudice. We disagree.
 

 
 *550
 
 Under Evidence Code section 500: “Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting.” Proof of cause for rescission was essential to plaintiffs’ claim for relief. Proof of prejudice was essential to plaintiffs’ constructive fraud theory. (Civ. Code, § 1573.)
 

 Plaintiffs argue they had no burden because the adoption agency as the dominant party is assumed to have exerted influence, with the result that
 
 any
 
 noncompliance constitutes undue influence per se. No authority is cited for this proposition.
 

 Though not cited by plaintiffs, it has been said in other contexts that where a confidential relationship exists and the dominant party obtained an advantage from a transaction, it is presumed undue influence was exerted, and the burden shifts to the dominant party defendant to prove the transaction was voluntary. (See
 
 Rader
 
 v.
 
 Thrasher
 
 (1962) 57 Cal.2d 244, 249 [18 Cal.Rptr. 736, 368 P.2d 360], citing former Civ. Code, § 2235, see now Prob. Code, § 16004;
 
 Barbara A.
 
 v.
 
 John G., supra,
 
 145 Cal.App.3d at pp. 383-384; 1 Witkin, Summary of Cal. Law,
 
 supra,
 
 Contracts, § 425, pp. 381-382.)
 

 However, even assuming that defendants in this case obtained an advantage from the relinquishments, we do not believe a shifting of the burden of proof is appropriate in actions to rescind relinquishments.
 

 First, the presumption that undue influence was exerted is not strictly applied in nonfiduciary confidential relationships. (1 Witkin,
 
 op. cit. supra,
 
 at p. 383.) More importantly, the Legislature has expressed a policy of according finality to relinquishments by providing that “[u]pon filing with the department, the relinquishment is final [unless there is mutual consent to rescission].” (Fam. Code, § 8700, subd. (d); see also,
 
 Adoption of Graham, supra,
 
 58 Cal.2d at p. 906 [strong state policy to give effect to relinquishments];
 
 Hall
 
 v.
 
 Department of Adoptions, supra,
 
 47 Cal.App.3d at pp. 902-903 [same].) Though courts have held the statute does not preclude an action in equity to rescind the relinquishment for cause
 
 (Brooks
 
 v.
 
 Los Angeles County Bureau of Adoptions, supra,
 
 218 Cal.App.2d 732), we are unaware of any decision placing the burden of proof on the adoption agency in a rescission action by a relinquishing parent.
 

 We believe the policy favoring relinquishments supports placing the burden on the party challenging the relinquishment to show prejudice from noncompliance with applicable regulations. Plaintiffs assert the statutory
 
 *551
 
 provision according finality to relinquishments assumes that the adoption agency has properly complied with all regulations. However, this merely reinforces our conclusion that the burden of proof in a rescission action should remain on the plaintiff seeking to rescind the relinquishment. Thus, if agency compliance is assumed, then the burden is properly placed on the party who claims noncompliance.
 

 Although this is not an adoption proceeding, requiring plaintiffs to show prejudice in order to rescind their relinquishments is also consistent with the rule that adoption requirements “are to be liberally construed in order to effect the object of the adoption statutes in promoting the welfare of children, bereft of the benefits of the home and care of their real parents. . . .”
 
 (San Diego County Dept. of Pub. Welfare
 
 v.
 
 Superior Court, supra,
 
 7 Cal.3d at p. 16, internal quotation marks omitted.)
 

 Finally, we think that plaintiffs are in the best position to adduce evidence showing they were prejudiced by noncompliance with regulations.
 

 We conclude constructive fraud constitutes a basis for rescission of a relinquishment of a child for adoption. However, we also conclude the plaintiff bears the burden of proving all aspects of constructive fraud, including prejudice.
 

 B.
 
 Waiver of Contention That Court Disregarded Theory
 

 Plaintiffs contend the trial court prejudicially erred in failing to consider constructive fraud as a ground for rescission. They base this contention on the trial court’s remark in its tentative decision (the “Opinion and Ruling”) that defendants’ violation of the regulations was of “limited relevance.” According to plaintiffs, the trial court thus improperly disregarded the regulatory noncompliance because it found no fraudulent intent on the part of defendants.
 

 However, a “judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.”
 
 (In re Marriage of Arceneaux, supra,
 
 51 Cal.3d at p. 1133.) Parties wishing to avoid inferences in favor of the judgment must obtain a statement of decision under Code of Civil Procedure sections 632 and 634. (51 Cal.3d at pp. 1133-1134.)
 

 Here, no party requested a statement of decision. The trial court’s written opinion and ruling was not a statement of decision but merely a tentative
 
 *552
 
 decision, which cannot be used to impeach the judgment.
 
 [25]
 
 (9 Witkin,
 
 supra,
 
 Appeal, §§ 263-265, pp. 270-273.)
 

 Thus, plaintiffs are left only with their contention that undisputed regulatory violations establish constructive fraud. We construe this contention as a claim that the trial court abused its discretion in denying rescission on a constructive fraud theory. We reject the contention.
 

 C.
 
 Admitted Violations Do Not Constitute Constructive Fraud
 

 As we have seen in part II,
 
 ante,
 
 defendants violated the DSS regulations by failing to (1) discuss the alternative of placing the baby with extended family members, (2) discuss educational or employment resources, (3) give copies of the executed documents to plaintiffs, and (4) obtain Darrah’s medical history.
 

 Plaintiffs fail to show these violations, separately or cumulatively, caused them to make a decision they would not otherwise have made. Thus, the violations did not prejudice plaintiffs.
 

 We conclude plaintiffs fail to show any error or abuse of discretion in the trial court’s judgment denying rescission of the relinquishments. We therefore need not address defendants’ argument that plaintiffs are estopped to challenge the validity of the relinquishments because they led all other parties to believe the child was being permanently relinquished.
 

 Disposition
 

 The judgment is affirmed.
 

 Scotland, J., and Raye, J., concurred.
 

 Appellants’ petition for review by the Supreme Court was denied January 5, 1995.
 

 [1]
 

 Since filing the complaint, Tyler has married Darrah and assumed his surname. For the sake of clarity, we will refer to her as Tyler.
 

 [2]
 

 Although plaintiffs appealed from the judgment without restriction, defendants DCPC and Huntziker have not filed a respondent’s brief in this court. Nevertheless, plaintiffs’ contentions on appeal are directed only against CHS and Heszler, as the parties responsible for complying with the DSS regulations. Since no contentions are directed against DCPC or Huntziker, we shall affirm the judgment in their favor without discussion. Hereafter, we use the term “defendants” to refer to CHS and Heszler only, Unless otherwise indicated.
 

 [3]
 

 In their appellate briefs, plaintiffs present a distorted picture of the factual background of this case. This case was a credibility contest, with sharply conflicting evidence. At trial plaintiffs’ version of events was that they contacted defendants for help in telling Tyler’s parents they had a baby, but instead defendants advised them not to tell their families and coerced, manipulated, and intimidated them into giving up the baby for adoption. Defendants denied plaintiff’s accusations and presented evidence contradicting plaintiffs’ testimony, as set forth below. The trial court disbelieved plaintiffs and believed defendants, as is reflected in the court’s 11-page “Opinion and Ruling.” Yet plaintiffs in their appellate briefs persist in presenting their discredited version of the facts. Plaintiffs also misrepresent the extent of defendants’ noncompliance with DSS regulations.
 

 Plaintiffs have an obligation to present an accurate statement of facts on appeal. (Cal. Rules of Court, rule 13.) As a reviewing court, it is not our province to analyze evidentiary conflicts.
 
 (In re Cheryl E.
 
 (1984) 161 Cal.App.3d 587, 600 [207 Cal.Rptr. 728].) We therefore disregard plaintiffs’ presentation of “facts” and set forth the facts consistent with the judgment.
 

 [4]
 

 We refer to Darrah as the “alleged father,” though he does not dispute paternity, because “alleged father” is a term of art in this context. (See fn. 5,
 
 post.)
 

 [5]
 

 An “alleged father” is one who does not meet the statutory definition of a “presumed father,” i.e., one who is married to the mother or receives the child into his home and openly holds the child out as his own. (Fam. Code, §7611.) An alleged father does not have automatic physical custody rights. His consent is not required for an adoption unless he demonstrates a full commitment to parental responsibility—emotional, financial, and otherwise. (Fam. Code, § 8605;
 
 Adoption of Kelsey
 
 S. (1992) 1 Cal.4th 816, 849 [4 Cal.Rptr.2d 615, 823 P.2d 1216].) The type of counseling required of the adoption agency differs depending on whether a man is a “presumed father” or an “alleged father.” (Cal. Code Regs., tit. 22, § 35134, subds. (a), (e).)
 

 Defendants considered Darrah to be an “alleged father” rather than a presumed father because plaintiffs were not married and, although the baby visited at Darrah’s house, Darrah did not take the child into his home
 
 to reside
 
 or
 
 openly
 
 acknowledge paternity. He did not tell his family about the baby (until the fall of 1991). Other than telling the truth to one friend, Darrah indicated to his roommates that Tyler was babysitting and Darrah did not know whose child it was.
 

 On appeal Darrah makes no argument that he is a “presumed father.”
 

 [6]
 

 Defendants assert the child, now three years old, continues to live with the prospective adoptive family, with whom she has lived since the relinquishments. Defendants argue against removal of the child from the only family she has ever known. However, as noted by the trial court, the best interests of the child are not at issue in a rescission action.
 
 (In re Cheryl E.,
 
 supra, 161 Cal.App.3d 587, 603.)
 

 [7]
 

 No statement of decision was requested. The “Opinion and Ruling” does not constitute a statement of decision (Cal. Rules of Court, rule 232 [announcement of tentative decision]) but may be used on appeal to discover the grounds for the judgment and show the absence of prejudice in any error.
 
 (Kuffel
 
 v.
 
 Seaside Oil Co.
 
 (1977) 69 Cal.App.3d 555, 568 [138 Cal.Rptr. 575]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 263-265, pp. 270-273.)
 

 [8]
 

 In their reply brief, while insisting their appeal raises no challenge to the sufficiency of evidence, plaintiffs nevertheless contend no substantial evidence supports a finding that Heszler is ethical and professional. However, it is unfair to raise new arguments for the first time in a reply brief; we therefore need not consider the contention.
 
 (Neighbours
 
 v.
 
 Buzz Oates Enterprises
 
 (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) Moreover, having reviewed the record, we conclude ample evidence supports the judgment.
 

 [9]
 

 Since plaintiffs signed their relinquishments, the Civil Code provisions material to this case were renumbered, then later replaced by the new Family Code, which was enacted by Statutes 1992, chapter 162, section 10, and became operative January 1, 1994. The new code applies to pending proceedings, with certain exceptions, e.g., contents and execution of documents filed before the operative date are governed by the old law. (Fam. Code, § 4.) The provisions at issue in this case have been continued in the new Family Code without substantial change.
 

 [10]
 

 Welfare and Institutions Code section 10553, which is cited in the California Code of Regulations as authority for creation of the regulations here at issue, provides: “The director [of DSS] shall... [¶] ... [¶] (e) Formulate, adopt, amend or repeal regulations and general policies affecting the purposes, responsibilities, and jurisdiction of the department and which are consistent with law and necessary for the administration of public social services . . . .”
 

 [11]
 

 We note under Family Code section 8621 (added by Stats. 1993, ch. 758, § 6, operative Jan. 1, 1995), DSS is expressly charged with monitoring licensed adoption agencies and reporting violations of regulations to the appropriate licensing authority.
 

 [12]
 

 The substance of former Civil Code section 224m has been continued in new Family Code section 8700, subdivision (d). Rescission by the relinquishing parents is also allowed if the relinquishment designates specific adoptive parents and the child is not placed with those persons. (Fam. Code, § 8700, subds. (e)-(g).)
 

 [13]
 

 Undesignated section references are to title 22 of California Code of Regulations.
 

 [14]
 

 Tyler asked Heszler if the prospective adoptive family could pay Darrah’s air fare from San Diego. Heszler said she was not sure but would check. Tyler commented that such an expense is regularly paid in independent adoptions.
 

 [15]
 

 Elsewhere in their brief, plaintiffs contend defendants violated section 35134, subdivision (a)(8), which requires that parents be advised of the right to revoke or rescind. However, plaintiffs fail to cite anything in the record showing this point was raised at trial. The portions of the transcript cited by plaintiffs refer only to a posirelinquishment conversation several months after the relinquishment forms were signed, in which Tyler asked for the child back and Heszler assertedly told Tyler she had no rights. This evidence was contradicted by Heszler, who testified what she told Tyler was that she (Heszler) would not intercede in Tyler's behalf with the prospective adoptive parents. Heszler sent Tyler forms to request rescission. In any event, these events occurred after plaintiffs signed the relinquishments and therefore have no bearing on whether the relinquishments were knowing and voluntary. Moreover, the advisements concerning revocation and rescission were contained in the Statement of Understanding.
 

 [16]
 

 Former Civil Code section 222.26 provided in part: “(a) No agency shall place a child for adoption unless a written medical report on the child’s medical background, and if available, so far as ascertainable, the medical background of the child’s biological parents, has been submitted to the prospective adoptive parents . . . .” (Stats. 1990, ch. 1363, § 3.) This provision was repealed (Stats. 1992, ch. 162, § 2), but its substance has been continued in Family Code sections 8608, 8706. (Stats. 1992, ch. 162, § 10.)
 

 [17]
 

 Though not argued by plaintiffs, we recognize a secondary purpose of the regulation may be to protect birth parents from abandonment of a child by prospective adoptive parents who later learn of medical problems. Plaintiffs assert that Darrah’s family has a history of cancer, heart disease, asthma, and scoliosis (curved spine). However, the cited portion of the record does not show evidence to that effect but only questions posed by plaintiffs’ attorney asking whether Heszler was aware of such history in Darrah’s family at the time of taking the relinquishments. Heszler said she was not aware. This is not evidence of Darrah’s medical history. Even assuming plaintiffs’ representation of the medical history is accurate, plaintiffs do not contend it has led or might lead to the prospective adoptive parents abandoning the adoption plan.
 

 [18]
 

 Licensed private adoption agencies are considered agents of the state.
 
 {Scott
 
 v.
 
 Family Ministries
 
 (1976) 65 Cal.App.3d 492, 506-507 [135 Cal.Rptr. 430].) In any event, a private party’s noncompliance with a law is similarly subject to an analysis of legislative intent in order to determine the effect of noncompliance where the statute does not specify an effect. (See
 
 General Motors Accept. Corp.
 
 v.
 
 Kyle
 
 (1960) 54 Cal.2d 101, 108-112 [4 Cal.Rptr. 496, 351 P.2d 768].)
 

 [19]
 

 We recognize plaintiffs claim they had a fiduciary relationship with defendants for purposes of constructive fraud analysis. As we discuss
 
 post,
 
 the relationship, though a confidential one, was not a fiduciary relationship.
 

 [20]
 

 We note plaintiffs limit their due process arguments to matters of procedural due process. We also note plaintiffs do not develop any argument based on the state Constitution.
 

 Plaintiffs contend parents have a constitutionally protected right to be free from unwarranted state intrusion into their relationship with their children, under the right to privacy discussed in
 
 Roe
 
 v.
 
 Wade
 
 (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705].) According to plaintiffs,
 
 any
 
 noncompliance with the regulations constitutes “unlawful” conduct, which is necessarily “unwarranted” conduct, which necessarily constitutes “unwarranted state intrusion” into parental rights in violation of the right to privacy. We do not find plaintiffs’ logic persuasive.
 

 [21]
 

 Failure to (1) discuss the option of placing the child with extended family members (2) discuss educational and employment resources (3) give copies of executed documents to plaintiffs and (4) obtain the father’s medical history.
 

 [22]
 

 Though not raised by defendants, we note Darrah, as an alleged father rather than a presumed father, is not necessarily entitled to the same due process as the mother. (See
 
 Lehr
 
 v.
 
 Robertson
 
 (1983) 463 U.S. 248, 256-262 [77 L.Ed.2d 614, 623-627, 103 S.Ct. 2985] [unmarried father lacking custodial, personal, or financial relationship with child was not entitled to notice of adoption proceeding];
 
 Adoption of Kelsey S., supra,
 
 1 Cal.4th at p. 849 [parental relationship of putative father is worthy of constitutional protection only if father demonstrates full commitment to parental responsibility—emotional, financial, and otherwise].) Since we conclude reversal of the judgment is not warranted by the full due process rights to which Tyler is clearly entitled, we need not consider whether a lesser standard applies to Darrah.
 

 [23]
 

 Actual fraud generally requires that the defendant act “with intent to deceive . . . or to induce [the plaintiff] to enter into the contract. . . .” (Civ. Code, § 1572.) However, a fraud claim may also be based on negligent misrepresentations.
 
 (In re Cheryl E., supra,
 
 161 Cal.App.3d at p. 599.)
 

 [24]
 

 Undue influence consists “1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; [¶] 2. In taking an unfair advantage of another’s weakness of mind; or, [¶] 3. In taking a grossly oppressive and unfair advantage of another’s necessities or distress.” (Civ. Code, § 1575.) Undue influence “consists in the use of excessive pressure by a dominant person over a servient person resulting in the apparent will of the servient person being in fact the will of the dominant person.”
 
 (In re Cheryl E., supra,
 
 161 Cal.App.3d at p. 601.) “Undue influence differs from fraud in that the importunities or beseechings may or may not include fraudulent representations. [Citations.]” (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 423, p. 380.)
 

 [25]
 

 Moreover, contrary to plaintiffs’ position, the written opinion and ruling does not unambiguously display an error of law. Since the trial court referred to “minor deviations” from the regulations, it is possible the court rejected a constructive fraud theory due to its conclusion there were no prejudicial violations rather than due to an erroneous belief that constructive fraud required fraudulent intent.