Filed 6/3/16  In re N.W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.W., A Person Coming Under the Juvenile Court Law. | |
| | D069598 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ001236) |
| v. | |
| I.W., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Tiffany Gilmartin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Daniela Davidian, Deputy County Counsel, for Plaintiff and Respondent.

I.W. (Mother) appeals from a juvenile court order limiting educational rights over her son, N.W., claiming she did not have actual notice of the proposed change. Assuming we reject her first argument, she contends the juvenile court abused its discretion. She also claims the juvenile court abused its discretion when it granted a Welfare and Institutions Code section 388[1] petition filed by the San Diego Health and Human Services Agency (the Agency) changing N.W.'s school of origin. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2015, when N.W. was eight years old, the Agency filed a dependency petition on his behalf under section 300, subdivision (b) alleging Mother had drunk alcohol on two occasions to excess. In both instances, law enforcement had to be involved. Following the second incident, Mother was placed on a 72-hour psychiatric hold after she hit N.W. in the stomach with her fist. The Agency removed N.W. from Mother's care and detained him at the Polinsky Children's Center. At the detention hearing, the juvenile court sustained the petition and ordered N.W. be detained out of Mother's care. It also ordered supervised visitation for Mother and that N.W. continue attending Albert Einstein Academy, his school of origin where he participated in a German language immersion program.

In late June 2015, N.W. was placed at the home of his maternal grandmother. In July 2015, Mother submitted on the petition. The juvenile court made a true finding on

_____

1      Undesignated statutory references are to the Welfare and Institutions Code.

the petition, placed N.W. with the maternal grandmother, ordered reunification services for Mother and supervised visitation. The parties were also ordered not to discuss the facts of the case with N.W.

In October 2015, the Agency placed N.W. in foster care after his grandmother violated court orders by allowing Mother to have overnight visitation with N.W. in her home. The Agency began a home assessment of N.W.'s maternal uncle and aunt who resided in Escondido, California. The uncle told the social worker that if the Agency placed N.W. with them they could not keep him in his current school. In November 2015, the Agency removed N.W. from his foster family after N.W. disclosed that his foster father asked him to bite his neck because it "felt good." As an emergency placement, the Agency placed N.W. with his maternal uncle. Immediately upon placement, the maternal uncle and aunt expressed concern with their ability to transport N.W. to his school of origin due to the long commute.

In late December 2015, the Agency filed a section 388 petition asking the juvenile court to change the school of origin order based on N.W.'s placement with his maternal uncle. At the hearing on the petition, the juvenile court discussed with counsel that if it were to change the school of origin order, whether a new educational rights holder would be needed if Mother persisted in her position that N.W. remain at his school of origin.

The juvenile court entered an order formally placing N.W. with his relatives and found it was in N.W.'s best interests to lift the school of origin order. The juvenile court also temporarily terminated Mother's rights to make educational decisions for N.W. and transferred those rights to N.W.'s uncle and aunt. Mother timely appealed.

3

DISCUSSION

## I. *Educational Rights*

A. Alleged Due Process Error

Mother contends the order limiting her educational rights over N.W. must be reversed because the Agency failed to file a section 388 petition or otherwise properly notice her that it sought to limit her educational rights. She asserts this amounts to structural due process error that requires automatic reversal of the order.

Due process demands that parents be afforded with adequate notice and an opportunity to be heard before being deprived of the companionship, care, custody and management of their child. (*In re B.G.* (1974) 11 Cal.3d 679, 688-689.) Procedural due process focuses on the fairness of a procedure that may deprive an individual of important rights. (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 412 (*Crystal J.*).) What constitutes procedural due process is not absolute. (*In re Matthew P.* (1999) 71 Cal.App.4th 841, 850.) "Due process is a flexible concept which depends upon the circumstances and a balancing of various factors." (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 817.) In the context of child dependency litigation, due process requirements are focused principally on the right to notice and a hearing. (*Crystal J.*, at pp. 412-413.) The failure to comply with state or local procedural requirements results in a due process violation only where the procedure itself falls short of standards derived from the due process clause. (*Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 546.)

Mother's complaint that the Agency failed to file a section 388 petition or otherwise properly notice her that it sought to limit her education rights overlooks that the Agency's section 388 petition referenced an addendum report where the Agency recommended that Mother share educational rights with N.W.'s uncle and aunt. Her argument also ignores what happened at the hearing. Namely, the juvenile court raised the issue of educational rights during a chambers conference after hearing the evidence. The juvenile court noted that Mother held educational rights and opposed changing the school of origin. The court asked the parties to address who would decide N.W.'s school if it lifted the school of origin order. The Agency contemplated filing a section 388 to address the issue and suggested a continuance to investigate the matter and file the petition. The court stated it was "not suggesting or prompting anything," but rather it wanted to know the parties' position that if Mother, as the educational rights holder, persisted in a decision that is not in N.W.'s best interests, whether the rights holder should change. The court then continued the matter to the following day.

After hearing from counsel, the court noted it had a continuing obligation under the California Rules of Court to consider a child's educational needs at every hearing. The court found that the issues of placement and school of origin were intertwined and recounted N.W.'s history in detail. Before completing its ruling, the court recessed the matter to the next day due to an emergency. The following day, the juvenile court ordered that N.W. be placed with his maternal uncle and aunt. The court lifted the school of origin order after acknowledging that while the hearing was not about Mother's

educational rights, that the court had done its best to comply with the spirit of the rules and the parties had a "full and fair hearing."

The juvenile court is required to consider a child's educational needs at the dispositional hearing and all subsequent hearings that might affect the child's education. (Cal. Rules of Court, rule 5.651(b)(2)(A).) The juvenile court properly raised the issue of who should hold N.W.'s educational rights and thereafter gave the parties an opportunity to address it over the course of two days. The record reflects the juvenile court's comprehensive knowledge of N.W.'s situation and its thoughtful analysis of the issue. No party objected to the juvenile court ruling on who should hold N.W.'s educational rights. Rather, after the court raised the issue at the hearing, Mother's counsel stated she "had the same question" after reviewing the law.

Mother's reliance on *In re Anna M*. (1997) 54 Cal.App.4th 463 (*Anna*) is misplaced. In *Anna*, the mother did not receive adequate oral notice or the required written notice that the department had changed its recommendation from guardianship to termination of parental rights and mother was absent from the hearing terminating her parental rights. (*Id.* at pp. 467-469.) Here, the parties received oral notice of the issue at the hearing, Mother was present with counsel and all parties had a full and fair opportunity to address the issue of who should hold N.W.'s educational rights. Accordingly, Mother has not demonstrated a due process error.

B. Alleged Abuse of Discretion

Assuming we do not reverse the trial court's order based on structural due process errors, Mother alternatively asserts the juvenile court abused its discretion when it

temporarily terminated her educational rights and appointed the maternal uncle. Mother contends the order designating the maternal uncle as N.W.'s educational rights holder was not in N.W's best interests because the uncle was uninformed and not prepared to meet N.W.'s educational needs. She reasserts her willingness to have N.W. placed in foster care over placement with his uncle in order to maintain his school connection.

Parents "have a constitutionally protected liberty interest in directing their children's education" (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276 (*R.W.*)), but the juvenile court may limit the right of a parent to make educational decisions on behalf of a child where necessary to protect the child so long as any such limitations do not exceed those necessary to protect the child (§ 361, subd. (a)(1)). In reviewing the juvenile court's decision to suspend a parent's education decisionmaking rights, we apply an abuse of discretion standard, keeping in mind the focus of dependency proceedings is on the child rather than the parent. (*R.W.*, at p. 1277.) "All educational decisions must be based on the best interests of the child." (*In re Samuel G.* (2009) 174 Cal.App.4th 502, 510.)

The juvenile court considered N.W.'s young age and his "fundamental need for a safe, supportive, stress-free environment which [meets] his daily needs." The court acknowledged Mother's ability to make educational decisions, but noted the circumstances were unique as the issue was whether Mother was advocating for N.W.'s best educational interests. It concluded that co-holding education rights with the maternal uncle was not in N.W.'s best interests because of the deterioration of Mother's relationship with the maternal uncle. Based on its findings, the court temporarily removed Mother's educational rights and appointed the maternal uncle. The court made

its order without prejudice and required that Mother be fully apprised of all information regarding N.W.'s education.

Mother has not shown that the juvenile court abused its discretion in temporarily removing her educational rights and appointing the maternal uncle. The principal at N.W.'s school of origin reported that Mother's communication was erratic and hard to understand. Mother spoke loudly and incessantly to any person she approached and followed teachers into their classroom to talk even after class had started. She sent lengthy inappropriate emails to teachers and staff, up to 181 emails to one teacher in five months. She also left long voice mail messages that were incoherent in terms of their content. Mother's behavior caused the school to implement a visitation policy for her, noting the "stress she caused teachers and staff was unparalleled by any parent we have had on our campus." The principal reported that N.W.'s poor attendance last year (34 tardies and 17 absences) and the year before negatively impacted his learning and ability to fully engage in the classroom culture and environment.

The court expressed significant concern with Mother's repeated violation of court orders while she held N.W.'s educational rights, noting she violated a visitation order and an order not to discuss matters with N.W. The record also shows she violated the court's confidentiality order at least 20 times by communicating with media and other individuals about her case. Mother's psychological evaluator recommended individual therapy sessions finding that Mother met the criteria for adjustment disorder, alcohol abuse and nonspecific personality disorder.

This evidence amply supported the court's decision to temporarily remove Mother's educational rights. We reject Mother's argument that it was not in N.W.'s best interests to designate the maternal uncle as N.W.'s educational rights holder. Although Mother initially described the maternal uncle as someone she respected and whom N.W. loved, after N.W.'s placement with the maternal uncle, Mother's attitude changed and she no longer spoke positively about the maternal uncle. This evidence suggests Mother and the maternal uncle could not have co-held N.W.'s educational rights. Finally, the juvenile court found the maternal uncle to be very credible and dedicated to his nephew. Mother's reliance on the maternal uncle's statement that he "looked through" N.W.'s IEP,[2] rather than stating he had "read" the IEP places undue emphasis on semantics and ignores the balance of the uncle's testimony.

Under the circumstances, we conclude the juvenile court did not abuse its discretion in temporarily suspending Mother's educational rights.

## II. *Section 388 Petition*

Mother asserts the juvenile court abused its discretion when it granted the Agency's section 388 petition because the Agency failed to meet its burden of showing how changing schools was in N.W.'s best interests and not just a convenience to the maternal uncle. She claims the Agency made no effort to ameliorate N.W.'s school

---

[2] An "IEP" is an individualized education program specifically designed to meet the educational needs of a disabled child. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1067.)

transportation issue and that other ways existed to ameliorate this issue without removing N.W. from his school of origin.

A party may petition the court to change, modify, or set aside a previous court order on the grounds of changed circumstances. (§ 388, subd. (a).) The party must show both a change of circumstances and that the modification would promote the child's best interests. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) We will not disturb the juvenile court's ruling absent a clear abuse of discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.)

Here, the juvenile court found a change of circumstances existed because N.W.'s placement had changed. The juvenile court carefully watched N.W.'s demeanor when he spoke about wanting to live with his uncle and aunt. The court found N.W.'s current schedule to be "very impactful" based on N.W.'s young age and his need to have adequate sleep and "down time." Based on its consideration of the evidence and its knowledge of the case, the juvenile court found it was in N.W's best interests to lift the school of origin order.

Driving N.W. to and from his school of origin, a round-trip commute of two hours, imposed a hardship on the maternal uncle and aunt. The record is clear, however, that this hardship did not prompt the juvenile court to change the school of origin order; rather, the court had before it abundant evidence that changing the school of origin would be in N.W.'s best interests. Namely, remaining at his school of origin required N.W. to get up about 5:00 a.m. or 5:30 a.m. in the morning, come home about 7:00 p.m. or 7:30 p.m. in the evening, talk to Mother and complete his homework. Some nights N.W.

did not get to bed until 10:00 p.m., sometimes later.  The social worker opined that even if N.W. was eligible to receive transportation to his school of origin, that the long commute and resulting late bedtime were concerns.  To eliminate the long commute to the school of origin, the social worker believed N.W. should be allowed to attend a new school close to the aunt and uncle's home.

Although N.W. testified that he had concerns about changing schools, he preferred staying with his uncle and aunt rather than moving to a foster home and staying at his school of origin.  It was undisputed that N.W. was doing well with his uncle and aunt and enjoyed living with them.  The education specialist at N.W.'s school of origin believed it was of utmost importance in terms of N.W.'s future academic progress to have a stable place to live with a family who cared about him.  The education specialist at N.W.'s school of origin acknowledged it was impossible to make exact predictions regarding how a change of school would impact N.W, but opined that N.W. was a friendly boy who wanted to make friends.  The uncle similarly believed it would not be difficult for N.W. to change schools because he was a "great kid."

Mother's concern that the uncle was ill-prepared to support N.W.'s educational needs is not supported by the record.  The education specialist at N.W.'s school of origin stated that N.W. did not have significant or unusual needs and qualified for IEP under a common category.  Additionally, N.W.'s uncle visited the school near his home and was informed that the staff would be able to follow N.W.'s IEP.  Finally, removing N.W. from his school of origin would necessarily prevent his participation in a German immersion program where the instruction alternated on a weekly basis between English and German.

11

On this issue, the court had before it a letter from the principal at N.W.'s school of origin noting the German immersion program was not beneficial to N.W. because he did not "engage in or retain the German language." She concluded that German was not a high priority for N.W. compared to meeting the goals of his IEP.

On this record, we conclude the juvenile court did not abuse its discretion in granting the section 388 petition to change N.W.'s school of origin.

DISPOSITION

The orders are affirmed.


McCONNELL, P. J.

WE CONCUR:



HUFFMAN, J.



McDONALD, J.

12